UNITED STATES, Appellant and Cross-Appellee

v.

BENJAMIN JOHNSON, Private E–2, U. S. Army, Appellee and Cross-Appellant

3 USCMA 209, 11 CMR 209

No. 768

Decided August 21, 1953

LT COL Thayer Chapman, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellant and Cross-Appellee.

LT COL George M. Thorpe, U. S. Army, 1ST LT Floyd V. Hull, Jr., U. S.

■■■■■■■■■■■■■

Army, and 1ST LT Thomas E. Cole, U. S. Army, for Appellee and Cross-Appellant.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Accused was charged with the murder of Lee Kum Song, a Korean national, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712. He was tried by a general court-martial, found guilty of unpremeditated murder, and sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for fifteen years. The convening authority approved the findings and sentence; but the board of review, holding that the instructions on the elements of involuntary manslaughter, a lesser included offense, were insufficient, reversed the case and ordered a rehearing.

Summarized, the facts are these. At about 6:30 o'clock on the evening of November 23, 1951, the accused was on duty as a member of the military police at Post No. 9, Police Sub-station No. 2 in Inchon, Korea. With him were three policemen, two Korean and one American. The victim, Lee Kum Song, also a Korean policeman, but not in uniform, approached the post carrying a flashlight. He was accosted by one of the two Americans and attempted to identify himself as a member of the Korean police force. The accused questioned his identification and relieved him of the flashlight. The accused concluded to retain the light so he gave the one he possessed to the other American guard. The victim followed the accused into the shack, protested his acts and requested the return of his property. The accused refused the request and he and the other American advised the victim to leave. The victim showed little disposition to comply so the accused pushed him out of the guard shack, followed a short distance, took his pistol out of the holster, pulled the hammer back, squeezed the trigger and the gun fired. The bullet struck the victim and subsequently caused his death.

To supplement the above facts and circumstances, which were furnished by the testimony of the two Koreans who were eyewitnesses to the shooting, a pretrial statement of the accused was introduced in evidence by the Government. In this statement, which was given some six hours after the incident, the accused corroborated much of the foregoing testimony. He stated that a Korean dressed in civilian clothes had come to the guard post during the evening of November 23, 1951; that he had taken his flashlight away from him; that about five minutes later the Korean prepared to leave and the accused refused to return the flashlight; that because it had a fairly strong light he had intended to keep it; that the Korean again asked for the light and accused told him to leave; that when he did not leave accused pushed him out of the door; that the Korean refused to go further; that the Korean was only about four feet away; that accused took out his pistol intending only to scare him; that he pulled the hammer back; that he did not know there was a round in the chamber; and, that he pulled the trigger and the gun fired.

The case is before us on a certificate by The Judge Advocate General of the Army who seeks an answer to the two following questions: (1) Did the evidence in this case reasonably raise an issue of involuntary manslaughter so as to require the law officer to instruct the court on the elements of that offense? (2) Were the instructions given by the law officer on involuntary manslaughter insufficient? Accused joined issues by filing a petition for grant of review but he asserts no specific error and submits the case on its merits. While this petition raises no new issues, there are several subsidiary questions involved in those certified by The Judge Advocate General which require our disposition.

The board of review held that the exculpatory statements of the accused, contained in his pretrial admission, to the effect that he did not know the gun was loaded, and that he intended only to frighten the victim, raised an issue of involuntary manslaughter requiring an instruction by the law officer. In order to dispose of that issue and, be-

cause similar situations have arisen so frequently, we deem it advisable to discuss the evidentiary effect of an exculpatory statement of an accused introduced into evidence by the prosecution. In order to carve out the rule which we believe should be followed in military proceedings, we shall explore some of the holdings in civilian cases.

Ordinarily a party is bound by the testimony of his own witnesses, especially if that testimony is not inherently improbable, is uncontradicted, and there is no claim of surprise or mistake. Wiget v. Becker, 84 F2d 706 (CA 8th Cir); Gold v. United States, 36 F2d 16 (CA 8th Cir); Yellow Cab Co. of Philadelphia v. Rodgers, 61 F2d 729 (CA 3d Cir); Jacobson v. Hahn, 88 F2d 433, 435 (CA 2d Cir); Cartello v. United States, 93 F2d 412 (CA 8th Cir). However, the rule applied in criminal law is not that broad. As stated in Wharton's Criminal Evidence, 11th ed, § 882, page 1521, it is generally as follows:

"A party to a criminal trial is entitled to any benefit which may be derived from evidence offered by the opposing party. However, when the state introduces a purported confession, it is not bound by the self-serving declarations contained therein. It vouches only for the fact that the admission or confession was actually made."

The rule quoted from Wharton, supra, is supported by the Supreme Court of Washington in State v. Williams, 142 Wash 630, 253 P 1074. That decision is selected because of the similarity in exculpatory statements:

"The second question raised by counsel is the lack of premeditation. The state introduced the testimony of a deputy sheriff and other peace officers, in which certain purported admissions and confessions made by the defendant were related. In each of these admissions and confessions the defendant claimed that he had not intended to kill, but had intended only to scare or frighten the deceased. Other testimony, including the testimony of an eye-witness, tended to prove conclusively premeditation and

the utmost deliberation on the part of the defendant. *The state, when introducing purported confessions, is not bound by the self-serving declarations therein contained, but vouches only for the fact that the admission or confession was actually made.*" [Emphasis supplied]

There are at least two Federal circuit courts which announce a similar principle and the reasoning is based, in part, upon the duties of prosecutors fairly to present all evidence. This requirement is similarly placed on trial counsel in the military. The Manual for Courts-Martial, United States, 1951, in paragraph 44g, on page 64, in outlining the duties of trial counsel, states:

"Although his primary duty is to prosecute, any act (such as the conscious suppression of evidence favorable to the defense) inconsistent with a genuine desire to have the whole truth revealed is prohibited. . . ."

In United States v. Palese, 133 F2d 600, the Court of Appeals for the Third Circuit stated:

". . . . It is true that courts have held under other circumstances that a party is bound by the testimony of a witness whom he produces. We think that rule does not apply to prosecutions in a criminal case, however. In such a case the Government does not necessarily give credence to a witness merely by introducing him, for it is the duty of the prosecution in a criminal trial to produce and use all witnesses within reach of process, of whatever character, whose testimony will shed light on the transaction, whether it makes for or against the accused. State v. Coolidge, 1934, 106 Vt 183, 171 A 244; see Blackburn v. State, 1925, 100 Tex Cr 580, 272 SW 173; People v. Minsky, 1919, 227 NY 94, 124 NE 126."

The Court of Appeals for the Eighth Circuit, held similarly in Epps v. United States, 157 F2d 11:

". . . . Appellant's other ground of alleged error is that there was not sufficient proof of the offense and also that the Government having intro-

duced through the police officer appellant's statement at the time he was accosted and arrested, is bound by it. Both points are without merit. What the police officer said in this respect was merely in relating the circumstances of the arrest and was no more than the witness said in his defense on the stand. It was incumbent on the Government to give the jury all the circumstances of the arrest, but we know of no law which would make the policeman's recital of the statement made by the accused at that time binding on the Government and not subject to contradiction by other facts or other evidence."

Apparently the general rule in Texas is contrary, but we believe it inappropriate to the military system. However, the courts of that State have recognized that the rule has variations. In Yarbrough v. State, 125 Texas Crim Rep 304, 67 SW2d 612, the court pointed out an instance where the rule must be modified. In that case we find the following language:

"It is well settled that, when the state has introduced a confession or admission of the accused containing exculpatory statements, it is ordinarily incumbent upon the court to instruct the jury that the exculpatory statements are regarded as true unless disproved. 24 Tex Jur p 598; Pharr v. State, 7 Tex App 478; Forrester v. State, 93 Tex Cr R 415, 248 SW 40, 26 ALR 537, and authorities cited. However, the rule is not applicable in all cases. [Citing cases.] For example, the rule has been relaxed in cases where the accused on trial testified before the jury and his testimony is in accord with the exculpatory features of his confession or declarations, and his defensive theory arising from his testimony and coinciding with his exculpatory theory advanced in the confession or declarations is fairly submitted to the jury in the charge of the court. Tex Jur supra; McKinley v. State, 104 Tex Cr R 65, 282 SW 600. Again, it has been held that the rule is not applicable where the state does not rely for a conviction wholly upon the statement of the accused. Tex Jur supra; Tate v. State, 116 Tex Cr R 340, 31 SW(2d) 453; Harris v. State, 103 Tex Cr R 479, 281 SW 206. . . . ."

Other jurisdictions could be considered as striking a medium between the Texas and Washington rules. We mention a few. In State v. Langdon, 46 NM 277, 127 P2d 875, the Supreme Court of New Mexico held that if the prosecution, after having introduced into evidence an admission or confession, is bound by the exculpatory statements contained therein, the statement must concern "some tangible, affirmative, defensive, exculpatory factual matter capable of specific disproof." In State v. Todd, 222 NC 346, 23 SE2d 47, the Supreme Court of North Carolina held that the State was not precluded from showing that the facts were different from those given in defendant's exculpatory statement, but that since no contrary evidence was offered, the statement excused the defendant. In State v. Darrah, 60 Idaho 479, 92 P2d 143, the Supreme Court of Idaho, in reversing a conviction for burglary, held that the State, having introduced exculpatory statements, was under the burden to prove them false. In State v. Capaci, 179 La 462, 154 S 419, the Supreme Court of Louisiana upheld the trial court's refusal to given an instruction to the effect that the State having introduced a confession containing exculpatory statements was bound thereby.

With the exception of the Texas case, the cited authorities treat with the statements as they affect the finding of guilt and not as a basis for instructional requirements. Even though we adopt the rule that the exculpatory statements are not binding on the Government and that they may be contradicted, weakened and otherwise attacked, this does not mean that they are not sufficient to frame an issue. For that purpose they should be considered as though the accused had given the statement from the witness stand and, unless their exculpatory statements are inherently improbable and unworthy of belief, they should be accepted by the law officer to frame his issues. Used in this

**213**

manner the court-martial would be left free to assess their weight and credibility.

We digress for a moment to point out one of the deficiencies in trial tactics. In many cases coming before this Court, we are presented with records which show that trial counsel introduced into evidence exculpatory statements made by an accused. In some instances they add little, if anything, to the evidentiary structure; in other, they may. But they are overlooked by both trial and defense counsel and the law officer. In this instance the law officer paid heed to the evidence as he instructed on an included offense, but not so with counsel. Neither trial nor defense counsel developed the theory mentioned in the statement. This causes us to wonder why it was introduced. It may have corroborated the details furnished by the Government witnesses but it was principally beneficial to the accused. However, trial counsel did not see fit to minimize its effect and defending counsel did nothing to fortify it. It was not without possibilities of further development as we note that accused was on duty at Inchon, Korea, which, according to the briefs, was some considerable distance behind the forward elements. We are uninformed as to the employment of his unit and the exact nature of his assignment; the likelihood that his duties might require loaded weapons; the orders, or lack of orders, respecting the placing of a round in the chamber; the standard operating procedure concerning the inspection of weapons prior to being posted, and while on guard; the length and extent of accused's training with the weapon; the number of rounds he fired; his statement, or lack thereof, immediately after the shooting, that he did not know the weapon was loaded; and other items which would weigh for or against his excuse. These are merely suggested as illustrative of items which might add to, or detract from, the statement and in that way assist the law officer and the court-martial in evaluating properly the weight to be given to the evidence.

Having held that the statement must be considered by the law officer, we move to answer the question of whether it raises reasonably the included offense of involuntary manslaughter. That crime is defined by paragraph 198b, Manual for Courts-Martial, United States, 1951, as follows:

"Involuntary manslaughter is an unlawful homicide (see 197a) committed without an intent to kill or inflict great bodily harm; it is an unlawful killing by culpable negligence, or while perpetrating or attempting to perpetrate an offense other than burglary, sodomy, rape, robbery, or aggravated arson, directly affecting the person.

"Culpable negligence is a degree of carelessness greater than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of such act or omission. Thus the basis of a charge of involuntary manslaughter may be a negligent act or omission which, when viewed in the light of human experience, might foreseeably result in the death of another, even though death would not, necessarily, be a natural and probable consequence of such act or omission."

The statement of the accused that he intended only to frighten the victim would, if believed, negate the intent to kill or inflict great bodily harm. There are some other circumstances in the record which lend credence to the story and there are others which tend to discredit it. We need not relate those as they merely add to or detract from the weight to be given to it by the court-martial. Our peculiar problem deals only with the formation of issues for instructional purposes and this statement is not inherently improbable or unworthy of belief. It is, therefore, sufficient to frame up an issue on two different theories: (1) that the killing occurred while the accused was perpetrating an offense directly affecting the person of the victim, and (2) the death was caused by culpable negligence on the part of accused. Accordingly, an instruction on involuntary manslaughter was demanded and the

first question certified to us must be answered in the affirmative.

The law officer did not overlook the necessity of instructing on that included offense but he fell into error by using the Manual form which we have already condemned. He instructed as follows:

"Among the lesser included offenses to the crime charged here today is involuntary manslaughter. The elements of involuntary manslaughter are as follows:

a. That the victim named or described is dead.
b. That his death resulted from the act or omission of the accused, as alleged.
c. Facts and circumstances showing that the homicide amounted in law to the degree of manslaughter alleged."

In United States v. Grossman (No. 796), 2 USCMA 406, 9 CMR 36, decided April 16, 1953, we held this particular instruction to be insufficient to define properly the offense. There we stated:

". . . . The instruction as given permits a verdict of guilty to be based upon a finding that the death of the victim was caused by an act or omission of accused superimposed upon some facts and circumstances that the court-martial concluded would show the degree of homicide alleged. We believe the third element to be so lacking in guideposts and standards of conduct that the court-martial could have based a finding on its own formulae. The criteria for measuring accused's conduct are unannounced and his act or omission is not delineated. The law officer furnished no measuring rod by which the degree of homicide could be determined. . . . Conceding the guilt of the accused is established, the instructions are so incomplete and so uninformative that to affirm the findings on this exposition of the law would be tantamount to saying that in a homicide case, court-martial members need only to be told that if they find the deceased died from acts of the accused, they may assess the degree of homicide.

The structure created by such an unlimited and sweeping charge does not meet the minimum requirements of the Code and we, therefore, hold the law officer erred in failing to give an appropriate instruction."

Our decision in that case requires our disapproval of the instruction under consideration here. This disposes of the second question.

Complete disposition of this case requires our consideration of one further issue. The accused was charged with unpremeditated murder which, under the Code, may be committed with or without intent. The specification herein was couched in general terms as it alleged the killing was committed by shooting with a pistol. This allegation may include an offense founded on an intent to kill or inflict great bodily harm under Article 118(2), supra; or, a killing while engaged in an act inherently dangerous to others and evincing a wanton disregard of human life under Article 118(3), supra. We entertain no doubt that the record contains sufficient evidence to support a finding of guilty in violation of Article 118(2), if the finding was made under that subsection. However, in instructing the court-martial on the elements of the offense of unpremeditated murder the law officer stated:

"The court is advised that the elements of the offense charged are:

"a. That Lee Kum Song is dead.
"b. That his death was caused by the accused shooting him with a pistol.
"c. That at the time of the shooting the accused intended to kill or to inflict great bodily harm upon him, or, that at the time of the shooting the accusd was engaged in an act inherently dangerous to others evincing a wanton disregard for human life."

In United States v. Joe L. Davis (No. 646), 2 USCMA 505, 10 CMR 3, decided May 14, 1953, and United States v. Holsey (No. 1296), 2 USCMA 554, 10 CMR 52, decided May 28, 1953, we held Article 118(3) to be applicable only in those cases where the dangerous act

of the accused was directed at people in general and that the inclusion of that element in an instruction in a case where the facts show the act to be directed at a particular individual was error. It is clear from those cases that the latter portion of the instruction should not have been given in this case. The court-martial could reasonably have been misled by the inclusion of that phrase in the instruction and the accused's rights were prejudiced thereby. This for the reason that he could have been found guilty on a theory not consistent with the law.

The questions certified by The Judge Advocate General, United States Army, are answered in the affirmative. The petition of the accused, being governed by the principles herein announced, is granted and a rehearing is ordered. The decision of the board of review is affirmed.

Judge BROSMAN concurs.

QUINN, Chief Judge (dissenting):
I dissent.

In order to create a necessity for instruction upon a lesser included offense, the evidence relied upon must fairly raise such lesser offense as a reasonable alternative to that charged. It is inconceivable that a military policeman on duty as such in a Korean combat zone would ever be unaware of whether or not his pistol was loaded. His assertion that he did not know the gun was loaded is so improbable as to require rejection. Certainly when viewed in connection with his further statement that he was engaged in the commission of the offense of larceny upon his victim, reasonable men cannot disagree that this shooting was deliberate.

I would answer the question certified in the negative.