UNITED STATES, Appellee

v.

JAMES D. LEE, JR., Corporal, U. S. Army, Appellant

3 USCMA 501, 13 CMR 57

No. 819

Decided December 18, 1953

LT COL James C. Hamilton, U. S. Army, for Appellant.
LT COL William R. Ward, U. S. Army, LT COL Thayer Chapman, U. S. Army, and MAJ Irvin M. Kent, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial upon three specifications which alleged the following offenses proscribed by the Uniform Code of Military Justice: (1) premeditated murder in violation of Article 118, 50 USC § 712; (2) and (3) assaults with grievous bodily harm intentionally inflicted, in violation of Article 128, 50 USC § 722. At the commencement of trial, the Government announced that it would not present any evidence on the second specification, and a motion for a finding of not guilty as to that offense was granted. Accused was found guilty of the included offense of unpremeditated murder under the first specification, and guilty of the remaining specification of aggravated assault. He was sentenced to a dishonorable discharge, total forfeitures and confinement for life. The findings and sentence have been upheld by Army reviewing authorities and the case is before this Court for a determination of questions concerning instructional deficiencies.

The evidence for the prosecution consisted of the testimony of three eye-witnesses to the shooting. They testified that on the evening of September 16, 1951, the accused entered a Korean house located at a particular place in Korea. As he entered he held a flashlight in one hand and a gun in the other. He asked if there were "any fathers around here," and his shouting awakened Han Sun Dong, a Korean occupant

of the house who was asleep on the floor. Accused proceeded through the house and he observed another Korean male, named Han Ok San. He shouted at the two Korean men and ordered them outside the house. Seconds later two shots were heard by occupants in the house and they went out to investigate. They found Han Sun Dong and Han Ok San lying on the ground severely wounded. The accused first fired at Han Sun Dong from a distance of about three and one-half feet, the bullet striking him in the neck and knocking him to the ground. The accused then turned the weapon on Han Ok San and shot him through the head. The victims were subsequently taken to a hospital and it was determined that Han Ok San's death was caused by a bullet wound at the base of his skull.

Counsel for the Government, in an effort to strengthen its case, introduced in evidence a pretrial statement of the accused. The story therein related is so at variance with the testimony of other witnesses and the other facts and circumstances found in the record that we pause to wonder if the accused is describing the same incident testified to by Government witnesses. To complete the evidentiary picture we quote those portions which are relevant to the shooting:

"When I arrive at the place where the Koreans wanted to go they told me to stop. As soon as they had got out of the jeep I departed from there

and went to the house where my girl was staying and she ask me why I did not come the nights before then or why I stayed away four days. So I explain to her why.

"But before going to bed I disconnected the 694 Radio on the jeep from the power unit and connected it a battery. Also pluged in the speaker which had a long cord and then turn on the radio which I put on stand by. I then carried the speaker inside of the house and told the girl to wake me up if she hear any GI's talking or if she hear any one talking over the speaker. I also told her to wake me up about 0430 after which I went to bed and went to sleep.

"It was not long after I had went to sleep when she woke me up and said that she think someone was trying to call me. So I open the door and look out where the jeep was parked, and then I saw two Korean men with both the 300 and 694 Radios. I grab my .45 cal pistol and fired at one of them which I hit in the head, I started to fire again when the girl struck my arm. But her arm struck the end of the barrel. The bullet glance across her arm and hit the second Korean in the neck.

"I went outside and put both of the radios in the jeep and then went back to house to look at Helen's arm it was bleeding very badly and she told me that carry her to a doctor. So I carried her out to jeep and departed. I carry her to Seoul where I looked for a Korean Hospital but I could not find one. So I carry her to a Korean MP Station, but I told her don't tell them about the two Korean men. The MP bandaged the wound on her arm she then told me that the MPs would carry her to a hospital and the home.

"But before I left I carried her outside and ask her did she want any money. She said she did so I gave her (200,000) two hundred thousand won, and told her that I would come to see her the next day and then I departed."

When the facts and circumstances related by the Government witnesses are compared with those contained in the exculpatory statement of the accused, only one matter of importance remains in dispute. It will be noted that the identity of the victims is established; that a killing and an aggravated assault are conclusively shown; that one victim died as a result of the wound and the other suffered serious bodily injury; and, that the accused fired the lethal weapon. This leaves the intent with which the accused killed one victim and assaulted the other as the only area of disagreement. In that field the evidence for the Government established a cruel, deliberate, intentional, and premeditated murder of one Korean, and an intentional infliction of great bodily injuries on another. If there is any substantial conflict, it arises out of the contents of the exculpatory statement as the accused did not produce any evidence to rebut the Government's case. Apparently he was content to rely on the weak link in the chain of circumstances, namely, the identity of the offender. He placed no emphasis on his unsworn statement which, at best, was no more than an abortive attempt to justify the violence as being necessary to protect Government property. However, we shall pass any deficiencies in that regard and test the statement to determine if it contains some substantial evidence to justify the killing. If it does then the law officer erred in not submitting that issue to the court-martial under appropriate instructions. On the other hand, if the evidence is insubstantial, inherently improbable or unworthy of belief, or, if believable, it shows the means of resisting the larceny were unreasonable, then an issue was not raised and the law officer did not err.

In United States v. Johnson, 3 USCMA 209, 11 CMR 209, we discussed the effect of an exculpatory statement contained in an admission or confession of an accused which was introduced in evidence by the prosecution. We held that, for instructional necessities, its contents were on a par with other evidence. We there stated:

". . . Even though we adopt the rule that the exculpatory state-

ments are not binding on the Government and that they may be contradicted, weakened and otherwise attacked, this does not mean that they are not sufficient to frame an issue. For that purpose they should be considered as though the accused had given the statement from the witness stand and, unless their exculpatory statements are inherently improbable and unworthy of belief, they should be accepted by the law officer to frame his issues. Used in this manner the court-martial would be left free to assess their weight and credibility."

In the case at bar, we conclude readily that any reasonable person would find the story related by the accused to be unworthy of belief. It should first be noted that although he makes mention of a number of individuals who were with him during the course of the evening, his story concerning his activities and his version of the shooting is without any corroboration. Furthermore, his story is so fantastic when viewed in the light of human behavior that one genuinely wonders if it can be contended seriously that it has the dignity of a defense. We, of course, cannot base unbelievability solely on irreconcilable conflicts in the testimony, but when the compelling evidence of a premeditated murder found in the record is placed alongside the inconsistent, improbable, and incriminating statements made by the accused, it becomes apparent why any reasonable person would cast aside his theory of justification as being unworthy of belief.

The narrow issue which first concerns us is whether the accused shot the two Koreans to prevent the theft of Government property. The time of the shooting was near midnight. It was dark and the accused claims he was sleeping in the house with a woman named Helen. This lady appears to exist only in the imagination of the accused as she is not mentioned by any other witnesses. Furthermore, the owner and occupants of the house were unaware of the fact that accused was sleeping there. He and Helen seem to have been tenants who were either unknown or unnoticed. When the accused was aroused, he claims to have gone to the front door and noticed the Korean men with a 300 and 694 radio taken from his jeep. He made a very complete and rapid appraisal under rather difficult circumstances. He grabbed his .45 caliber pistol, fired at one of them, and observed that he had hit him in the head. He then aimed at the other, who apparently was not attempting to escape, and just as he fired, Helen struck his arm. In so doing, she projected her arm in front of the barrel of the weapon. The bullet struck her and then hit the second Korean in the neck. Accused proceeded outside, put the two radios back in the jeep, returned to the house, observed that Helen was bleeding profusely, and then left with her to seek medical assistance. He entirely ignored the fate of the two severely wounded Koreans, but he was careful to admonish Helen not to mention the fact that he had wounded them. There was no dispute that the two victims were occupants of the Korean home and they were shot while they were very near the front door. Accused places himself in the doorway at the time of the shooting and the record otherwise shows the Koreans at not more than three feet away from him when they were wounded. If, therefore, they had removed the two radios from the car as contended by the accused, they would have carried them to a point where a verbal demand would have resulted in their recovery. However, without sounding any warning and without attempting any less dangerous methods of obtaining the return of the property, he fired two rounds from his pistol when he was so close to the victims that he was able to notice that one was struck in the head and the other in the neck. In spite of his knowledge that the Koreans were seriously wounded, he utterly ignored them, obtained possession of the radios, replaced them in the jeep, returned to the house, left with his girl, and took her to a medical installation for first aid treatment. After paying her a sum of money, he departed, returned to his company area, made no mention of the incident, and made no report to military authorities.

**505**

Furthermore, while testifying on the voluntariness of his statement, he furnished evidence that for four days he refused to make any statement concerning the shooting, his presence in the area, or his connection with the incident, and that the reasons he finally made any admissions were because he was informed he could be positively identified as the murderer, and that a story from him would reduce the crime from murder to manslaughter.

One way to test unworthiness is to measure accused's conduct by the ordinary standards of human behavior. If we do that we find the pattern pieced together by him to be so hostile to that followed by any reasonable person that a court-martial would be bound to reject it. It can be asserted with confidence that if he did not conjure up imaginary and irrational reasons for his misconduct, then there is no explanation for his post-shooting actions. Had the two Koreans been engaged in an offense such as the stealing of Government property, and had the accused been attempting to carry out his instructions to protect that property, he would not have feared detection. Here his every effort was directed toward concealing his claimed devotion to duty. It seems more than unusual that a promise of a reduction of the charge from murder to manslaughter and an assertion that he could be positively identified as the criminal was required to get him to disclose that he was performing properly a soldier's obligations.

For the purpose of disposing of the second issue, we can assume some degree of truthfulness in the statement given by the accused and yet find that the issue of justification was not reasonably raised by the evidence . Article 108 (e), 50 USC § 702, provides that if a member of the armed forces willfully or through neglect permits any property of the United States to be lost, damaged, destroyed, sold, or wrongfully disposed of, he shall be punished as a court-martial may direct. While that Article requires that members of the armed forces use due care to protect Government property, we are certain Congress did not intend to change the ordinary principles of law and authorize a member

of the armed forces to deliberately kill to prevent a larceny when less violent measures would be effectual.

Paragraph 197b, Manual for Courts-Martial, United States, 1951, in discussing justification for a homicide, states:

"A homicide committed in the proper performance of a legal duty is justifiable. Thus executing a person pursuant to a legal sentence of death, killing in suppression of a mutiny or riot, killing to prevent the escape of a prisoner if no other reasonably apparent means are adequate, killing an enemy in battle and killing to prevent the commission of an offense attempted by force or surprise such as burglary, robbery, or aggravated arson, are cases of justifiable homicide."

While the examples enumerated are not all inclusive, they do suggest that the offense must be of an aggravated type and the killing must be necessary to prevent the commission of the offense. This is substantially the same rule as announced in civilian jurisdictions. Warren on Homicide, paragraph 137, pages 636 and 637, states as follows:

". . . While it is true at common law, and in certain cases, under the Codes, that one person may kill another for the prevention of a forcible and atrocious crime, still, to make such homicide justifiable, there must be an absolute necessity for it; and it must be in good faith, for the purpose of preventing harm, and not from a private motive, and upon reasonable grounds to believe that there is a design to commit a felony. There must be a bona fide belief that a felony is being committed. To justify homicide to prevent perpetration of felonies other than homicide, the danger or felony intended must not be problematical or remote, but evident and immediate. It is immaterial, to the justification of homicide in resisting a forcible felony, whether the act was a felony at the common law or made such by statute. However, the killing of a thief engaged in a misdemeanor, is unjustified. A killing to prevent commission of a

misdemeanor, such as petit larceny, is not justified."

The two foregoing authorities fairly suggest at least two factors which must be considered in connection with the defense to a killing in the protection of property. The first is that the crime be of a forceful, aggravated, or serious nature. The second requires that the homicide must be committed in an honest belief that it is necessary to prevent the loss of the property. The statement of the accused fails to establish either of these. Because there is an overlapping of the two factors we will discuss them as one. Much of the discussion is forced because, as previously stated, the pretrial statement is palpably false and it is difficult to assume that an untrustworthy statement bespeaks the true conditions. The offense, if any, being committed by the Koreans would be no more than a taking without force or violence. There was no necessity for repelling any force against the accused. The jeep was on the street; taking was not from the immediate presence of the accused; there was no violence on the part of the Koreans, no fear on the part of accused, and the Koreans were not fleeing with the property. The victims were on, or immediately in front of, their own property where they had a legal right to be located. They were in such close proximity to the accused that he could easily have covered them with a weapon and reclaimed possession of the property without killing. There is no suggestion that they were armed and a shout to halt might have accomplished the desired results. The accused was concealed, armed, and protected. They were helpless and at his mercy. He gave them no opportunity to dispossess themselves of the property and he used the most violent means to enforce return. He does not claim he fired to threaten, scare, or for persuasive purposes. His version is that he deliberately intended to kill and the physical facts corroborate that much of his story. He had time to consider a reasonable method to prevent the loss of the property and a challenging round could have been fired without a fatality.

It may be that life in Korea is not regarded very highly, but the deliberate and calculated shooting of two persons, with little if any regard under such inoffensive circumstances, coupled with his callous disregard for the consequences of the shooting, weigh heavily against justification. That defense to a homicide may be brought into issue and instructions required where there is some semblance of good faith present in the record. But here we find a homicide which is admittedly committed without reason, justification, or excuse. Necessity and good faith are both absent. Accordingly, if, at this late date in the proceedings, it can be contended that the defense had a theory of justification which it was pressing at the trial level, the record does not disclose any evidence in support thereof. That being the case, there was no duty on the part of the law officer to instruct.

Turning to the instructions given by the law officer, it is contended that he failed to instruct on the elements of unpremeditated murder which was the offense found by the court-martial. The instructions which were given adequately defined premeditated murder. The court found the accused guilty except as to the words "with premeditation." Therefore, we are not concerned with an unguided finding by the court-martial, for the elements of the offense of unpremeditated murder were all included by the law officer within the definition of premeditated murder and the court-martial was required to find every essential element of unpremeditated murder to return the finding. We have previously answered this contention adverse to the accused in United States v. Day, 2 USCMA 416, 9 CMR 46, and United States v. Sechler, 3 USCMA 363, 12 CMR 119.

In this instance we can go one step further as we have held there need be instructions only on those lesser included offenses reasonably raised by the evidence and the fact that a court-martial brings back a verdict of guilty on a lesser included offense does not necessarily prove that crime was in issue.

In United States v. Bartholomew, 1 USCMA 307, 3 CMR 41, the accused was charged with premeditated murder, but the court-martial returned a finding of guilty of voluntary manslaughter upon which no instructions had been given. There was no evidence which reasonably placed that offense in issue and we held the law officer did not err in failing to instruct on that crime. We there stated:

"It is not necessary, however, that we pass finally on this question. Even if the court-martial in the present case was not justified in finding petitioner guilty of voluntary manslaughter, it did so in fact—and we fail to see how such error could possibly have harmed the accused. The evidence clearly establishes murder. Most jurisdictions of the United States have held that if the evidence warrants conviction in a higher degree of homicide than that found, the appellant may not complain even though the lower degree in fact found is not supported by the evidence . . . ."

". . . A court acting reasonably would have been wholly justified in inferring malice—if not premeditation—from this cold-blooded act of homicide. This being so, and conceding the commission of error in permitting the finding of voluntary manslaughter to stand, we fail to see how this can have harmed petitioner in any way."

The mere fact that the court-martial in this instance found the accused guilty of murder, not premeditated, does not require a finding by us that that degree of murder was in issue. The accused entered the Korean's house with a gun in his hand. When told to leave, the man who spoke out against him and another one nearby were escorted outside and then from a distance of about three and one-half feet the accused shot the first one in the neck. After the first shot he turned his attentions to the deceased and shot him through the head. The record is devoid of any evidence of drunkenness, mental sickness, or disorder which might go to negate pre-

meditation. Testimony on adequate provocation, accident, negligence, or even confusion is absent. The actions of the accused were purposeful and deliberate. They show a calm, cold-blooded killing, completely devoid of reason or justification, and with ample time to plan the killing. The abortive attempt to use a pretended theft as an excuse does not lessen the degree of the crime. The shots were fired at the head of the victim, and death was the natural and probable result of that act. After the first shot was fired, striking the first victim in the throat, there was time for the accused to pause and consider the consequences. He chose to fire again. For reasons known only to the court-martial, they chose to strike the words "with premeditation" from the charge. However, the accused is certainly in no position to complain because if error was committed, it was to his benefit.

The decision of the board of review is affirmed.

Chief Judge QUINN concurs.

BROSMAN, Judge (concurring in the result):

I concur in the result.

Properly to review the adequacy of the instructions in this case requires a detailed scrutiny of the events of the trial. Accused was charged with shooting two Korean men, killing one and wounding the other seriously. Three Korean witnesses—among them the surviving victim—related that they, together with the deceased, were asleep in their home when an American colored soldier, carrying a flashlight and a rifle, entered, awakened them, and asked if "there were any fathers around here"—whatever this expression may have meant. One man shouted, directing the soldier to leave. This Korean and another were then taken by the soldier out of the house and into its courtyard. Two shots rang out shortly, and thereafter those in the house went to the courtyard to find both men shot.

Identification of the accused as the American soldier who had entered the house was attacked at the trial through the elicitation on cross-examination of

information to the effect that each of the three Korean witnesses had indicated to agents of the Criminal Investigation Division shortly after the shooting that he could not recognize the assailant. To rehabilitate its witnesses, the prosecution then attempted to establish that from a line-up, containing a number of colored soldiers, two of the witnesses had previously identified the accused. The defense thereupon offered evidence of circumstances suggesting connivance in the conduct of the line-up.

The Government sought to bolster its case by offering in evidence an extrajudicial statement of the accused made to representatives of the Criminal Investigation Division. In this statement the accused had explained that on the night of the alleged murder he had stopped at a Korean house to spend the night with a woman friend. Shortly after retiring he heard a noise outside. Opening the door, he observed two Korean men engaged in removing a pair of radios from his jeep. Thereupon he drew his pistol and shot them both.

The defense did not at all choose to take refuge in any exculpatory declarations contained in this statement, but instead offered strenuous objection to its admission. To support this objection, accused took the stand and urged that the statement had been extracted from him by assurances that to make such a statement might lead to reduction of the homicide charge from murder to manslaughter, or even to the dismissal of all charges. Despite this claim, the law officer admitted the statement in evidence—a determination I cannot characterize as improper in light of the evidence concerning voluntariness.

At the conclusion of the evidence, and after arguments of counsel, the law officer undertook to instruct the members of the court-martial as required by the provisions of the Uniform Code of Military Justice and the Manual for Courts-Martial, United States, 1951. With respect to elements, instructions were given only as to premeditated murder and aggravated assault, the specific offenses alleged. Several varieties of *assault* were mentioned as lesser offenses included within *premeditated murder,* but these were not the subject of instruction. No lesser included offenses whatever were mentioned in connection with the assault alleged under Charge II.

## II

In determining whether the instructions were sufficient, we must first consider whether they would have been adequate in light of the evidence of record, apart from the accused's extrajudicial statement introduced by the prosecution—and thereafter whether the admission of that statement served in any way to change the situation. Clearly, unpremeditated murder was raised as a reasonable alternative to the offense of premeditated murder charged. The latter crime requires proof of a "consciously conceived . . . specific intent to kill." Manual, supra, paragraph 197d; United States v. Baguex, 2 USCMA 306, 8 CMR 106. Here the evidence bearing on the possibility of premeditation is hardly strong, with the result that the triers of fact might have concluded—as they in fact did—that, although an intent to kill was proved, premeditation was not. Of course, the resulting offense, in the absence of a showing of premeditation, would be unpremeditated murder. Descending the scale of homicide offenses, I am sure that voluntary manslaughter was not raised as a reasonable alternative—for there is no single shred of evidence characterizing the killing as a product of "the heat of sudden passion caused by adequate provocation." Uniform Code of Military Justice, Article 119, 50 USC § 713. Nor was involuntary manslaughter fairly raised—as a hasty reference to the definition of that offense makes plain. *Ibid.* And the same is certainly true as to negligent homicide. Finally, since it was established that the victim of the homicide was dead as the result of an act of accused, the latter could hardly have been guilty of some form of mere assault. United States v. Davis, 2 USCMA 505, 10 CMR 3. Thus I conclude on the basis of the evidence of record, apart from the extrajudicial statement, that the possible existence of two crimes was rea-

sonably raised by the evidence: premeditated murder and unpremeditated murder. The first offense was the subject of elemental instruction; the second was not. In failing to charge on unpremeditated murder, the law officer committed error.

### III

In considering the effect of the accused's statement, we encounter the language of United States v. Johnson, 3 USCMA 209, 11 CMR 209, to the effect that:

". . . Even though we adopt the rule that the exculpatory statements are not binding on the Government and that they may be contradicted, weakened and otherwise attacked, this does not mean that they are not sufficient to frame an issue. For that purpose they should be considered as though the accused had given the statement from the witness stand and, unless their exculpatory statements are inherently improbable and unworthy of belief, they should be accepted by the law officer to frame his issues. Used in this manner the court-martial would be left free to assess their weight and credibility."

Although the extrajudicial statement of the accused had taken the form of testimonial evidence furnished by him from the witness stand, I find nothing therein which would require instructions on lesser crimes. According to its terms, the accused had intentionally shot two Koreans—and there was no suggestion of "heat of passion." The only conceivable issue the statement might operate to raise would have had to do with whether the shooting was justifiable, since done "to prevent the commission of an offense attempted by force or surprise." See Manual for Courts-Martial, United States, 1951, paragraph 197b. If the statement did suffice to raise this affirmative defense, the law officer committed error in omitting instructions thereon. United States v. Ginn, 1 USCMA 453, 4 CMR 45.

I feel in no way called upon to deter-

mine whether the extrajudicial statement of the accused, under any construction thereof, presented matters which would constitute justification for the homicide—or indeed whether homicide may ever be justified when undertaken to prevent the crime of larceny. Instead, my examination of the record of trial has convinced me that, under the defense theory of the case, any right at this level to claim justifiable homicide has been the subject of waiver. The defense, it will be recalled, focussed its entire efforts on destroying the effect of testimony identifying accused as the murderous soldier in question. Thus, the basis for seeking acquittal, as demonstrated conclusively in the closing argument of defense counsel, was that the prosecution had not shown beyond a reasonable doubt that the accused was the soldier who had shot the Koreans. Consistent with this theory of defense, counsel objected vehemently to the admission in evidence of the accused's extrajudicial statement. The clear purport of that objection, in light of the accused's testimony in support thereof, and his counsel's various observations, was that the accused had been improperly induced to make the statement by promises of benefit. The very core of the accused's statement had been *exculpatory*—that is to say, that he had shot two Koreans to prevent the perpetration of a larceny. By his objection, therefore, defense counsel can only be taken to have said that the court-martial should disregard the accused's statement in passing on the issue of guilt. I do not hesitate for a moment to hold that the accused's extrajudicial statement—which at the trial defense urged the court to disregard—shall not now be construed to have raised an affirmative defense in his behalf. Cf. United States v. Mundy, 2 USCMA 500, 9 CMR 130.

I have no sort of wish to criticize defense counsel in his choice of trial tactics. Indeed, I suspect he would have weakened his case substantially in seeking to argue alternatively both failure of identification and justifiable homicide. Can we imaging him, for example, using the following approach? The Gov-

ernment cannot show that the accused was at the scene of the shooting. However, if he had been there, he would have been engaged in justifiable homicide. My point is that, without going into the wisdom of trial tactics, the defense here made a calculated and informed choice as to the course it would follow. Consequently, it cannot now complain of being held to that course. It goes without saying that I have no desire to sap United States v. Johnson, supra—with which I am in full accord—through utilization of the doctrine of waiver. I am sure I have not done so. Here defense counsel objected vigorously to consideration by the court of the accused's extrajudicial statement, the essence of which was the presentation of a possible affirmative defense. Thereafter he offered testimony of the accused himself designed to show that the statement was improperly induced—and thus, by implication, that it was untrustworthy. In such a situation I would consider it anomalous to reverse because the law officer failed—without request therefor—to instruct on some affirmative defense the statement might be construed to raise. It is indeed true that a law officer is under a positive duty to instruct concerning the issues of a case before him. However, he certainly labors under no burden of instructing on those which are not a part thereof. Here, so far as the defense was concerned at the trial, the affirmative defense of justifiable homicide was not in issue—this because the defense theory was that the commission of no sort of homicide by the accused could be established by the Government. Thus, throughout the trial, and to the very moment of the court's withdrawal for deliberation on its findings, defense counsel was asserting that the statement in question was not the sort of evidence its members should utilize—even be permitted to utilize—in reaching its determination. Now appellate defense counsel would have us say that, on the contrary, the statement should have been given weight by the court-martial as in itself sufficing to raise an affirmative defense. Acceptance of this contention would involve the application of legal rules *in vacuo,* and would free defense personnel from the reasonable consequences of their knowing election of trial tactics.

### IV

It has earlier been said that the law officer erred in failing to instruct on the elements of unpremeditated murder. Does it follow that this error requires reversal in the case at bar—that is, that there is any fair risk that the substantial rights of the accused were materially prejudiced? I am sure that there was no prejudice here, and that reversal is not required. The court-martial having found the accused guilty of the lowest offense reasonably raised as an alternative under the law and the facts, the prejudice resulting from the law officer's instructional omission was wholly removed. No residue of prejudicial error remains. United States v. Baguex, supra; United States v. Arnovits, 3 USCMA 538, 13 CMR 94; United States v. Gibson, 3 USCMA 512, 13 CMR 68.

Accordingly I agree with my brothers in their affirmance of the decision of the board of review.