UNITED STATES, Appellee

v.

ANDREW L. GAGNON, Boatswain, U. S. Navy
(Retired), Appellant

5 USCMA 619, 18 CMR 243

No. 5557

Decided April 15, 1955

John L. Nixon, Esq., and Maj Charles J. McCaffrey, USMCR, for Appellant.

Maj Charles B. Guy, USMC, for Appellee.

GEORGE W. LATIMER, Judge:

I

The accused was convicted by general court-martial of conspiracy to dispose wrongfully of Government property in violation of Article 81, Uniform Code of Military Justice, 50 USC § 675; wrongful disposal of Government property in violation of Article 108, Uniform Code of Military Justice, 50 USC § 702; and larceny of Government property in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. He was sentenced to dishonorable discharge and confinement for three years. Intermediate reviewing authorities have acted so as to reduce the confinement to a year and six months, but have otherwise affirmed. We granted review to consider the contention advanced by the accused that the law officer erred in failing either to give a requested instruction on the effect to be given to evidence of good character or to cover that subject in any of his other instructions. Proper consideration of this issue requires a detailed development of the facts.

According to the witnesses for the Government, the first and second charges arose out of the following facts and circumstances: The accused and a storekeeper by the name of Breedlove, on or about July 1, 1952, entered into a discussion concerning Government supplies which were stored at the Naval Station, Green Cove Springs, Florida. The accused, a retired member of the Navy, was employed at that base as a civilian dispatcher and labor supervisor, and Breedlove was working there in the capacity of a supply employee. They agreed upon an arrangement whereby Breedlove would deliver uninventoried Government materials located at the base to the accused who was to dispose of them and divide the proceeds with Breedlove. Some two weeks later, the accused introduced Breedlove to Samuel Gartner, a local dealer in scrap metal, who agreed to purchase the items obtained as a result of the scheme. Early in September 1952, Breedlove caused a truck load of steel floor plate and aluminum sheet to be delivered to Gartner's warehouse. A Navy truck and truck driver were utilized for the purpose of transporting the materials, which were worth approximately $3,-000, and were the property of the United States. Gartner paid $700 to the accused as the purchase price for the items, and Breedlove received half of that sum as his share of the proceeds. After Breedlove came under suspicion in connection with the theft and sale of the property, the accused asked Gartner to deny any acquaintanceship with him. Furthermore, he assured Gartner that Breedlove would not divulge any information to the official investigators. As it turned out, that was a hollow and overly optimistic assurance.

To sustain the third charge, the Government proved that on or about September 1, 1952, Breedlove, at the request of the accused, took about twelve sheets of plywood from the Naval Station without authorization, and delivered them to the home of the accused. A few days later the accused used the plywood in the course of renovating his home.

The accused testified that he had never conspired or agreed to steal, sell, or share the proceeds from the sale of Government property; that he had introduced Gartner to Breedlove, but without any knowledge on his part that he was furthering an illegal business transaction; that both Gartner and Breedlove were his friends of several years standing, and the meeting of the threesome at Gartner's warehouse was pure happenstance; that he picked up an envelope containing $700 from Gartner and delivered it to Breedlove because Breedlove had no transportation and offered him $100 to run the errand; that he knew the envelope contained money, and suspected Breedlove of selling Government property, but did not know why the money was being exchanged; that he asked Gartner to deny that he had anything to do with the transaction because he did not want to be involved in any way in Breedlove's troubles; and that he in no way had

**621**

procured the theft by Breedlove of plywood from the Naval Station.

Independent of his own testimony, the accused established that Breedlove had not implicated him in the illegal venture until after he failed to meet Breedlove's demand for $2,500 for Breedlove's continued silence and expected trial expenses. Whether the accused ever promised to pay this sum was a disputed issue at trial.

During the course of the presentation of the prosecution's case, Commander Harrison, supply officer at the Naval Station, was presented as a witness to establish a shortage. On cross-examination, it was shown that the accused had worked under the direction of the Commander for well over a year prior to this incident. During this time, the nature and quality of service rendered by the accused was such as to cause Harrison to testify that he had every confidence in the honesty and reliability of the accused. The witness stated he had a great deal of respect for the accused, both as a man and as an employee, prior to this incident.

Following the presentation of evidence, and prior to the arguments, a conference was held between the law officer and counsel for the parties to discuss the proposed instructions. At that time, defense counsel requested an instruction on character evidence and offered this proposed instruction:

"That the good character of the accused is a fact making strongly for the inference that he is innocent and this is not to be rejected or disregarded even when the evidence against him is direct. Circumstances may be such that an established reputation would create a reasonable doubt of guilt and require an acquittal even though aside from such reputation, the evidence might be convincing and justify a conviction. (CMO 5, 1945, 224, 225; 2, 1943, 36; 1, 1942, 159)."

The law officer refused to instruct as requested, expressing the view that no evidence had been presented by the defense as to the good character of the accused. Defense counsel called the

testimony of Commander Harrison to the attention of the law officer, but that did not bring about a different ruling.

## II

It is an accepted rule in the Federal courts that evidence of good character is admissible, for such testimony, standing alone under certain circumstances, may be enough to raise a reasonable doubt of guilt, Michelson v. United States, 335 US 469, 476, 93 L ed 168, 69 S Ct 213. That was the thrust of our opinion in United States v. Browning, 1 USCMA 599, 5 CMR 27, where we said that character evidence is important to an accused's defense, for it may become a factor which tips the scales in his favor. In United States v. Schumacher, 2 USCMA 134, 137, 7 CMR 10, we held that a law officer had no obligation to instruct, *sua sponte*, on the effect of character evidence, but we subsequently made it crystal clear that where the good character of the accused is in issue, and defense counsel submits a requested instruction embodying an acceptable rule on that subject, the law officer errs to the substantial prejudice of the accused if he fails to instruct as requested. United States v. Phillips, 3 USCMA 137, 11 CMR 137.

## III

We need pause only briefly to answer the arguments of counsel on the adequacy of the instruction submitted to the law officer by defense counsel. It would appear that the principal part of the proposed instruction is no more than a slight paraphrase of the language found in Edgington v. United States, 164 US 361, 366, 41 L ed 467, 17 S Ct 72 (1896), where it was said:

". . . The circumstances may be such that an established reputation for good character, if it is relevant to the issue, would alone create a reasonable doubt, although without it the other evidence would be convincing."

In this case the law officer gave no instruction on the effect of character evidence and, therefore, under our pre-

viously announced decisions, we need not measure the technical niceties of defense counsel's formulation. In United States v. Burden, 2 USCMA 547, 10 CMR 45, we had occasion to observe:

". . . It is certain the proposed instruction was sufficient to put the law officer on notice that an instruction on voluntary intoxication was essential to a proper disposition of the case. . . . we can find no good reason why the law officer did not give the requested instruction or one modified to fit the occasion."

And in United States v. Phillips, supra, we had occasion to apply this *rationale* from the Burden opinion to the question of character evidence. Thus we reaffirm the rule that defense counsel is not to be denied his request when his proposed instruction is sufficient to put the law officer on notice that some instruction on an issue is deemed essential properly to advise the court-martial. We come, then, to the two important questions in this case. Was there sufficient evidence of good character in the record to raise it as an issue at trial? If so, was the failure of the law officer to instruct on the issue prejudicial to the accused? We believe both questions must be answered affirmatively, for reasons to be set forth below.

## IV

We have mentioned in the recitation of facts that Commander Harrison testified on cross-examination that prior to this incident he regarded the accused as honest and responsible; and that he had a good deal of respect for the accused as a person and as an employee. The Commander had an everyday working association with the accused as a subordinate and the relationship had existed for well over a year. Thus it may be taken as established that he had an opportunity to form a reliable opinion as to accused's character. Furthermore, it must be acknowledged that the specific character traits of honesty and reliability are particularly relevant where the offense alleged is larceny. Hawley v. United States, 133 F 2d 966, 972 (CA 10th Cir 1943); State v. Ferguson, 222 Iowa 1148, 270 NW 874, 882 (1937). Government counsel seek a haven by contending that Harrison testified as to his personal opinion of the accused, and that such opinion evidence is inadmissible in the Federal civilian courts. We agree fully that a witness in those courts may not testify as to his personal opinion concerning a specific trait of a defendant's character, Michelson v. United States, supra, but such is not the rule in military law, Manual for Courts-Martial, United States, 1951, paragraph 138f(1), page 243; United States v. Haimson, 5 USCMA 208, 17 CMR 208.

The law officer apparently embraced the notion that a defendant is not entitled to an instruction on character evidence unless it is adduced from defense witnesses for he based his refusal to instruct upon the stated ground that there had been no evidence presented by the defense as to the good character of the accused. If we construe his language correctly, he interpreted the law erroneously, for we believe that an accused may rely upon favorable evidence to raise an issue, even though it is presented through Government witnesses.

In United States v. Johnson, 3 USCMA 209, 11 CMR 209, we held that the Government was not bound by the exculpatory remarks found in a pretrial statement made by an accused and introduced by the prosecution, but we also announced that favorable evidence introduced in that manner could be sufficient to raise an issue, where it was not inherently improbable or unworthy of belief. We later reaffirmed the Johnson holding in United States v. Lee, 3 USCMA 501, 13 CMR 57, and Federal authorities support us in this area.

In Tatum v. United States, 190 F2d 612 (CA DC Cir 1951), evidence relative to the insanity of the defendant was introduced by the Government, and it was held sufficient to raise an issue as to that question. Again, in United States v. Phillips, 217 F2d 435 (CA 7th Cir 1954), it was held that evidence elicited through cross-examination of

prosecution witnesses alone may be sufficient to raise an issue of good faith reliance on the advice of others, where it is alleged that the defendant willfully evaded the income tax laws.

Moreover, we believe the law officer overlooked other testimony in the record. To the testimony of Commander Harrison must be added that furnished by the accused. He established that he had served for 23 years in the Navy prior to retirement, and had never before been charged with a crime. That testimony was not rebutted or in any way weakened by evidence to the contrary, and while it is doubtful that an accused tends to establish his good character by showing that he has never before been arrested or charged with a crime, Posey v. United States, 26 App DC 302, 306 (1905), another question is presented by the evidence of his long and honorable service. We might, with propriety, suggest that a member of the Naval service could not serve on active duty for over twenty years and thereafter retire without receiving an honorable discharge, but here we need not go that far, for Government counsel has conceded before us that the accused's service was satisfactory at the time of his retirement in 1946. While civilian courts have held ▮▮ that an honorable discharge from one of the services is not admissible as evidence of good character, Hodge v. United States, 13 F2d 596, 598 (CA 6th Cir 1926), the rule in the military is otherwise. The Manual for Courts-Martial, supra, provides (paragraph 138*f*(2), page 243):

"In order to show the probability of his innocence, the accused may introduce evidence of his own good character, including evidence of his military record and standing and evidence of his general character as a moral well-conducted person and law-abiding citizen."

That the military rule represents sound doctrine for at least the military is illustrated by the following excerpt from the work of Dean Wigmore (Wigmore, Evidence, 3d ed, § 59):

". . . The soldier is in an environment where all weaknesses or excesses have an opportunity to betray themselves. He is carefully observed by his superiors,—more carefully than falls to the lot of any member of the ordinary civil community; and all his delinquencies and merits are recorded systematically from time to time on his 'service record', which follows him throughout his army career and serves as the basis for the terms of his final discharge. The certificate of discharge, therefore, is virtually a summary of his entire service conduct, both as a man and as a soldier. When it is 'honorable' in its import, it implies a career successfully negativing all of the more common traits involved in criminal charges. . . . In view of the high moral value attached to an honorable discharge in the military community, . . . it is fitting that the evidential import of such certificates should be liberally recognized."

We have, then, two reliable sources which supply favorable testimony as to specific traits of character which tend to negate the intent necessary to establish the crimes of larceny, conspiracy, and wrongful disposition of Government property. We believe they were of sufficient quantity and quality to put the character of the accused in issue.

V

We are told by Government counsel that accused disclosed an informal choice not to put his character in issue because only ▮▮ Commander Harrison, out of a total of twenty-seven witnesses called during the course of trial, was interrogated on the subject. However, we are singularly unimpressed by that argument. We have never understood that the question of whether a specific issue was raised at trial could be resolved by counting the number of witnesses who were not interrogated on the subject. The question presented depends for its solution not primarily upon the quantity of evidence presented, but upon its quality and relevancy. There was nothing inherently improbable, self-contradictory, or equivocal about the character evidence found in

624

this record, and its relevancy to this trial cannot be disputed. The fact that it was quantitatively scanty is not controlling. Character evidence is sufficient to raise an issue if a reasonable court-martial member could believe it and if, once believed, it casts some doubt on the guilt of the accused.

## VI

Having concluded the law officer erred in refusing to instruct upon the effect to be given to evidence of good character, it is not at all difficult to demonstrate that his refusal was prejudicial to the accused. The strength of the case for the Government depended largely upon the testimony of Breedlove, an admitted accomplice and coconspirator. The following incriminating facts and circumstances are found solely in his testimony: That he and the accused agreed to obtain and sell property belonging to the Navy; that his introduction to Gartner by the accused was for the purpose of obtaining an outlet for the loot; that the accused arranged the assignment of a particular, and "fixed," driver for the delivery of the supplies to Gartner; that the details of the plan through which Government property was diverted were known to and agreed upon by the accused; that the accused received half of the proceeds of the sale of the materials; that the accused asked him to steal some plywood from the Naval Station for the benefit of the accused; and that the accused promised to give him $2,500 for his silence after Breedlove was brought to bay by the officials at the base.

If we are to pit the credibility of disputants against each other, then what was Breedlove's standing as a credible witness? He was, by his own admissions, a coconspirator and accomplice in this affair. During a searching cross-examination it was developed that he had made inconsistent pretrial statements, in that he had not earlier named the accused as a principal, and had never done so until after he failed to obtain a large sum of money from the accused. Furthermore, if it is assumed that he testified truthfully as to the merits at trial, then it must be conceded that prior to trial he was willing to accept money to protect a criminal. If it is assumed that he lied as a witness, then admittedly he attempted to peddle his truthfulness for ready cash. Few more devastating attacks could be made upon Breedlove's credibility than those which he himself made at trial. Granted that his testimony could be believed, and that if believed the evidence is sufficient, it cannot fairly be said that his testimony would compel a finding of guilt.

Samuel Gartner, an alleged coconspirator, testified as a Government witness but he added little in the way of clinching testimony. He stated that the accused introduced Breedlove to him as a person who might have some surplus property to sell; that he accused gave him no reason to suspect that the items to be sold were stolen or that Breedlove was a member of the Navy; and that when the accused picked up the $700.00 from him, he professed to be no more than Breedlove's messenger.

Finally, the Government's case against the accused was not strengthened by the testimony of the truck driver who made the delivery to Gartner's warehouse.

On accused's side of the ledger we have some suspicious circumstances. He admitted that he had introduced Breedlove and Gartner, but denied any sinister purpose. He testified that he knew that certain persons were stealing Navy supplies, but it was not his duty to stop them. He concededly collected money from Gartner, but in his version he did so, not as a participant in the conspiracy, but as a highly paid messenger boy. He accepted plywood from Breedlove knowing that it had been stolen, but he did not solicit the commission of the theft. He asked Gartner to conceal Gartner's acquaintanceship with Breedlove because he wanted nothing to do with Breedlove's difficulties. In great detail the accused denied the truth of the substance of Breedlove's testimony, and contended that he had accepted the stolen plywood from Breedlove only because the lumber

had been unloaded at his home in his absence, and he thereafter did not know how to get rid of it. Finally, he vigorously contended that he never promised to pay Breedlove any sum at any time for Breedlove's continued silence, but on the contrary, Breedlove had unsuccessfully attempted to extort money from him.

When the entire case was considered with care, the court-martial was faced with a decision as to which of two co-conspirators to believe. Unless good character was considered, neither had much to offer to bolster his own testimony. Accused had the benefit of the testimony but he was denied the instruction which would have informed the fact-finders as to how to use properly that which had been given them. They may not have been ignorant of that use but accused was entitled to have it fixed with certainty and he so requested. With that background, we believe prejudice is apparent.

The decision of the board of review is reversed.

Chief Judge QUINN and Judge BROSMAN concur.