UNITED STATES, Appellee,

v

HARRY L. KACHOUGIAN, Private First Class, and
ROBERT S. STARR, Sergeant, U. S.
Army, Appellants

7 USCMA 150, 21 CMR 276

151

No. 6677

Decided June 15, 1956

*Edward P. Gallogly, Esq.,* argued the cause for Appellant, Kachougian. With him on the brief was *Leo Patrick McGowan, Esq. Major Edwin Doran* argued the cause for Appellant, Starr.

*First Lieutenant Lewis W. Evans* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant A. Kenneth Pye.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The above-named accused were charged jointly with the offenses of attempted robbery in violation of Article 80, Uniform Code of Military Justice, 50 USC § 674, and felony murder in violation of Article 118, Uniform Code of Military Justice, 50 USC 712. At the time the case was referred to a general court-martial for trial, the convening authority directed that it be considered as a noncapital offense. The accused were found guilty, and because the Code fixed the punishment, they were sentenced to life imprisonment. However, all members of the court-martial, including counsel and the law officer, recommended mitigation of the term of confinement. The Staff Judge Advocate recommended against clemency, and the convening authority approved the sentence as imposed. On appeal the board of review affirmed the findings but reduced the period of confinement to twenty-five years. We granted accused's petition for review to determine the single question of whether the law officer erred in refusing to instruct on lesser included offenses. That issue requires a detailed statement of the facts.

At about 1:30 a.m. on June 5, 1954, Sergeant McCallion and the accused, Sergeant Starr, left their company area after having received information that Korean prostitutes were plying their trade near a regimental rifle range. The night was dark and as they approached the range area, they were challenged by one Private Trojanovich. He was one of the sentries guarding the range area; the other was the accused, Kachougian. Prior to the arrival of the Sergeants, Kachougian had left his post to repair to the area where the women were located. When Sergeants McCallion and Starr were challenged they asked for Kachougian and the sentry informed them that he had gone down in the pits with the Koreans. Apparently Kachougian returned to the sentry post for he met the two sergeants and, with the aid of his flashlight, escorted them to the area of activity. After illicit relations had been had by McCallion and perhaps others, Sergeant Starr ordered one of the Korean males to hold up his hands. He had concluded to relieve the Koreans of their money and requested Private Kachougian to cover them with his carbine. While Starr was rifling the pockets of one victim of the attempted robbery, the weapon discharged killing the other. The two accused then left but they were apprehended the same day and gave pretrial statements. Because neither testified on the merits at the trial, their contentions on appeal must be assessed by reference to the words of those written confessions. Sergeant Starr's version of the incident, as reported by him at 2:00 p.m. on the day of the killing, is as follows:

". . . On 5 June 1954, at approximately 0030 hours, I and Sgt McCALLION, a friend of mine, heard that their were some prostitutes down near the 27th Inf Regt Rifle Range. We decided to go down and have a look. When we arrived at Post #27, the Rifle Range, the sentry, Pvt TROJONAVICH CHALLENGED US, AND AFTER WE IDENTIFIED OURSELVES, WE ASKED HIM WHERE THE OTHER SENTRY, Pfc KACHOUGIAN was. Pvt TROJONA-VICH told us he was down in the pit area with the prostitutes. I and Sgt McCALLION walked down into the area behind the pits. Evidently Pfc KACHOUGIAN saw us and called to us and directed us to the prostitutes. They were located beside a stream, approximately seventy-five (75) yards behind the targets in the pit area. Their were three (3) Korean prostitutes and two (2) Korean

154

Pimps. Pfc KACHOUGIAN asked what we wanted. Sgt MCCALLION said he wanted to have sexual intercourse. I told Pfc KACHOUGIAN that I had came to see if I could get some of the ninty dollars ($90.00) back that had been stolen from me on or about the 2nd of June 1954 by some Korean Pimps . . . I told him, 'Lets try to scare them'. I then told Pfc KACHOUGIAN to cover them with his Carbine, my idea being that this would frighten them and I could search the two (2) Pimps and take any MPC's they might have. Pfc KACHOUGIAN agreed to cover them with his Carbine. Sgt MCCALLION who was very drunk, kept asking what I was going to do. He kept asking me to leave, saying again and again, 'Bud lets go!' However, I continued searching the Pimps. I just had sufficient time to empty the Pimps right front pocket which contained a red ladies belt and an empty wallet, . . . And instantaneously, I heard . . . a short burst . . . I was not looking in Pfc KACHOUGIAN direction and did not see what happened. . . ."

Private KACHOUGIAN, whose statement was given earlier, recounted the evening's events in these words:

". . . On 4 June 1954, at 2200 hours, I was posted on Post #27, 27th Inf Rifle Range, with Pvt Paul TROJANOVICH, of my unit. At approximately 2215 hours, I observed a Korean 'Pimp Boy' walking around with a flashlight down in the rifle range pits. I new that he was a pimp because the guards from the 1st releif told me that their were some 'Sexies' down near the stream about 50 to 75 yards from our post. The Korean pimp whistled to me and I returned his whistle; this is a signal to soldiers letting them know that there are some Sexies nearby. When I got to the stream their were three Korean girls, two pimps, and five soldiers in the area. Pvt TRAJONAVICH remained behind to watch our post . . . Sgt STARR and Sgt MCCALLION came over to me and asked where the 'Mooses' were. I returned with them; Sgt MCCALLION

and . . . and had sexual intercourse . . . Sgt STARR did not have a girl. After we finished, Sgt STARR said that he was going to 'roll' them and get his money back. He did not explain what he meant. He said to me, 'When I tell you to, you hold your gun on them', indicating the Korean Pimps. I loaded and placed a round in the chamber of my carbine, a M–2, #6925050, which was in automatic firing position. He grabbed the other pimp by his shirt . . . At this time I was just holding my carbine and waiting. Sgt MC-CALLION, who was drunk kept asking Sgt STARR to leave. In the meantime I ordered the other Korean pimp to squat down with his hands behind his head. Sgt STARR was searching the other Korean. Suddenly the Korean who was squatting in front of me jumped at me. I was holding my carbine at my hip, my left hand was on the balance of the stock, my right hand was around the trigger guard. When the Korean jumped at me, somehow or other my finger hit the trigger, and I fired a burst of three rounds. . . ."

At the trial, defense counsel requested the law officer to instruct the court-martial on the lesser included offenses of unpremeditated murder, involuntary manslaughter, and negligent homicide. The principle relied on by him to support the request was the premise that the attempted robbery was completed prior to the homicide. Obviously that theory was untenable and the request was refused. There was no other alternative suggested by the testimony, and the law officer ruled that the facts did not reasonably raise any crime other than felony murder. He, therefore, charged the court-martial on the premise that the accused were guilty of the principal offense of a murder committed in an attempt to rob, or they were not guilty at all. In so ■■■■■■ ■ doing, he followed the general rule, as there is substantial agreement in decided cases that where the evidence establishes without contradiction that the killing occurred during the perpetration of a robbery, no lesser included offenses are

reasonably raised and no instructions on those offenses are necessary. Goodall v United States, 180 F2d 397, 400 (CA DC Cir) (1950); Green v United States, 218 F2d 856 (CA DC Cir) (1955).

For reasons which hereinafter appear, we conclude the law officer evaluated the evidence properly and instructed correctly when he directed the court-martial to return a finding of guilty of felony murder or not guilty. The theories used by defense counsel at the trial have been, for all practical purposes, abandoned on this appeal and a unique hypothesis substituted therefor. Before the board of review and before this court, the accused contend that the evidence required an instruction on certain lesser included offenses because the court-martial might have found that Starr was seeking only to recover money which he honestly believed had been taken from him, or that Kachougian believed that to be so. It would then follow that accused might have been viewed as only guilty of unpremeditated murder (in using greater force than that reasonably necessary) or involuntary manslaughter, based on a theory of culpable negligence. Similarly, it might also be concluded that accused Kachougian was guilty of a different and lesser offense than Starr, depending upon his own state of mind. United States v Jackson, 6 USCMA 193, 19 CMR 319.

We have no reason to dispute the contention that robbery is a compound offense consisting of an assault and a larceny. United States v Calhoun, 5 USCMA 428, 18 CMR 52. Therefore, we can accept, as a general principle of law, that a person is not guilty of robbery in forcibly taking property from the person of another, if he does so under a bona fide belief that he is the owner of such property, or is assisting an owner. People v Rosen, 11 Cal2d 147, 78 P2d 727 (1938). Even though we accept the rule, the facts of this case fall far short of meeting its requirements.

In United States v Johnson, 3 USCMA 209, 11 CMR 209, we held that if an exculpatory statement by an accused is not inherently improbable, and is admitted in evidence, it must be considered by the law officer in framing his instructions. In this instance, we need not concern ourselves with deciding whether such a statement by one accused may be used to the benefit of the other, for we will assume it may and give each accused the benefit of all the favorable facts related in both confessions. But we cannot adopt a converse rule, as the inculpatory evidence found in one pretrial statement cannot be used to strengthen a case against the other accused. United States v Borner, 3 USCMA 306, 12 CMR 62. We must, therefore, measure the record independently as to each accused. Before doing that we believe it worthwhile to note that Starr's confession contains two comments which appellate defense counsel contend are favorable to both accused. They are: "I told Pfc KACHOUGIAN that I had came to see if I could get some of the ninty [sic] dollars ($90.00) back that had been stolen from me on or about the 2nd of June 1954 by some Korean Pimps," and "I told him, 'Lets try to scare them.' "

We first consider the facts which demolish the contentions advanced by the accused Starr. His only support must come from his self-serving statement that his presence in the pits was for the purpose of regaining some of the money which had been taken from him on June 2, 1954. If, as he stated, he had lost $90.00, by his own statement that misfortune had occurred some three days before this killing. Where, geographically, that incident occurred is undisclosed, but circumstances exclude the area herein involved. He started out on his ill-fated venture after midnight possessed only of information that Korean prostitutes were operating in the rifle pit area. No identification was furnished to him, and if he left his billet with an intent to make himself financially whole, his contemplated source of recoupment could have been any Korean male or female. It was dark, no attempt was made to determine if the Koreans at the rifle range were the same persons who had

156

relieved him of his money on the previous occasion, and the record conclusively establishes they were not. Literally, he was taking from a class, not from a prior offender. The robbery attempt did not take place until after the sexual acts had been completed by Sergeant McCallion, and there was no thought given as to how much or how little would be recovered. Starr must have believed he would not regain all of his stolen money, or its equivalent, for he announced an intention of recovering only part of his money. The whole plan, viewed objectively, was no more nor less than a forcible taking from those who would be in no position to complain. Certainly, one seeking to recapture his own property should make certain he had chosen the right offender before using a deadly weapon to force compliance.

That Starr had a specific intent to deprive the victims of their valuables is beyond cavil, and his criminal intent may be gathered from his direction to Kachougian to use a deadly weapon to frighten the Koreans. Moreover, after the shooting, he made a physical examination of the victim, found the bullet wound, told the Koreans the victim was not hurt, and then fled, despite the fact that he was a medical aid sergeant. His excuse for not rendering first aid was that he panicked. Finally, during the afternoon of the same day he planned a suicide, but his attempt was abortive. It would thus appear that from the beginning to the end, the script of this unfortunate tragedy shows Starr consciously participating in a felony murder and nothing less. In so far as he is concerned, the law officer ruled correctly.

The same result must be reached as to accused Kachougian. His claimed defense must rest on an honest belief in his own mind that Starr was seeking to regain his lost money. For the purpose of his appeal, we will give him the benefit of the evidence in Starr's statement which his counsel asserts is beneficial. We have already quoted the statements, and so we seek to evaluate them through the spectacles given to the law officer by Kachougian. What belief did these remarks by Starr engender in Kachougian? His own statement provides the answer, and it belies any claim that he believed Starr had any legitimate purpose. According to his version of the homicide, there were three prostitutes, two Korean males, and five soldiers in the area just prior to the killing. He was armed because he was supposed to be on duty as a sentry. He understood that Starr was to "roll" the Koreans and he was to cover them with his carbine. Obviously, his role was to frighten them into submission. He operated the weapon's action so there would be a round in the firing chamber, and he fired because the Korean victim jumped at him. Furthermore, Starr did not inquire as to the identity of the Koreans, did not seek anyone's assistance in acquiring "his" property by less violent means, had removed a belt and wallet from one victim before the shot was fired, and all of this was known to Kachougian. He does, of course, mention in his statement that Starr did not say what he meant, but that may refer to Starr's expressed desire to recoup part of his earlier losses, and is far short of saying that he misunderstood the common meaning of the word "roll" and honestly believed he was committing no offense. It is clear to us that what was intended here was to engender sufficient fear so that the property of the Koreans could be taken without verbal protest or physical resistance. That is the fear contemplated in the crime of robbery, and to use a weapon to cause that mental condition is a criminal act, not a lawful act. Far from believing that Starr was requesting his help in asserting a claim of right, Kachougian could only have understood that Starr intended to do just precisely what he attempted to do, namely, by force and fear to take from the victim any money or valuables, regardless of ownership. His subsequent acts are inconsistent with his assertion of innocent intent, for he, too, fled from the scene of the incident.

Of course, most of the foregoing

must be extracted from a pretrial statement made by Kachougian, for at no time from the beginning of this tragedy until the present moment has he ever produced or pointed to a scintilla of other evidence which tended to establish that he truly believed he was assisting Starr in a legal endeavor to recapture Starr's property. With five soldiers in the area, just why Starr had to request small arms support to make up his losses is not made apparent. Surely he had sufficient resources of friendly manpower available to him so that he could have demanded the return of "his" property without resorting to gunplay, and Kachougian must have realized that Starr intended to perpetrate a robbery, for he knew that Starr had not accused the Koreans of stealing from him; that Starr intended to "roll" the victims; and that his coaccused wanted the support of a lethal weapon in the accomplishment of that purpose.

We, therefore, hold that no reasonable person could read the relevant portions of the two statements and arrive at a conclusion that Kachougian honestly believed he was helping a buddy recapture his own property. To do that, such pieces of evidence as the time of night, the location of the incident, the purpose of the visit, the failure to seek identification, the statements of the participants, the loading of the weapon, the facts and circumstances immediately preceding the killing, and the flight of the accused would have to be given no consideration. In the final analysis, we can end this discussion by observing that the evidence is overwhelming that a robbery was being attempted and that death resulted before the crime was completed. That is felony murder by any standard.

While we believe it fair to state that a crime as serious as murder was not contemplated by the ac- ▪ cused, the law—for good reason—states that a killing while attempting to perpetrate a robbery is murder. Regardless of the after-shooting action taken by them, the intent to steal by force of arms was established beyond all reasonable doubt, a death resulted while the rifling of the

**158**

victim's clothing was in progress, and both accused defended partially on the theory that there were no included offenses. A reference to the arguments of their trial defense counsel will disclose that they sought to obtain a finding of innocence by contending, in part, that a life sentence was the mandatory minimum, and that that was too severe for this type of offense. In this connection, it is of interest to consider that their argument preceded the instructions, and they never thereafter sought to have the law officer submit included offenses to the court-martial.

In view of the foregoing, we conclude that no lesser offenses were in issue, instructions on them would have been improper, and the decision of the board of review must be affirmed.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The question presented for our review is whether the law officer should have instructed on lesser included offenses. This issue results from the accused's contention that, at the time of the homicide, they were not attempting robbery but were merely endeavoring to recover military payment certificates belonging to the accused Starr.

After some drinking, Sergeants McCallion and Starr left their company area, at about 12:30 a.m. on June 5, 1954, to "have a look" at some Korean prostitutes that were reported to be operating at the rifle range. Arriving at the pits of the range, they were challenged by Private Trojanovich, one of the two sentinels stationed to guard the range area. When they had identified themselves, they inquired as to the whereabouts of the other guard. Trojanovich informed them that he was behind the pits. Kachougian was the other guard. He had left his post on hearing a whistle which indicated the presence of prostitutes. Kachougian "Evidently saw" Starr and McCallion because he "directed" them with his flashlight to a point about seventy-five yards from the pits. About one half hour later, the accused and McCallion returned to the pits. A few minutes

earlier, Chae You Choe, a Korean male, had been shot and killed by Kachougian.

Eight persons were present at the immediate scene of the homicide. Besides the accused and McCallion, there were three Korean women prostitutes and two Korean males, one of whom was Chae, the deceased. Six of these persons gave evidence in one form or another. Although the exact sequence of events from the time of Starr and McCallion's arrival is not too clear, there is agreement on most of the important elements required to establish the prosecution's case. The point of disagreement is in regard to the intention of each accused.

It appears that after Starr and McCallion joined Kachougian and the Koreans, there were some moments of jocularity. McCallion fell two or three times and "they all laughed" at him. McCallion then "went off to one side" with one of the girls. What each accused did during the period that McCallion was away does not appear too clearly. Neither of them testified at the trial. Each, however, gave a pretrial statement to Criminal Investigation Detachment agents which was admitted in evidence. In his statement, Kachougian implies that he had intercourse with one of the prostitutes. Thus, he first indicates that Starr abstained; then he says, "After *we* finished" the incident arose which culminated in Chae's death. Starr's statement does not mention his conduct during this period. In any event, all persons at the scene reassembled after McCallion had concluded his sexual affair. The Koreans started to leave. McCallion also started to leave. He said, "Come on Starr, let's go." Starr replied that "he wasn't going until he got his money back." McCallion did not know what Starr meant by this remark. Kauchougian also refers to Starr's reply. He says that Starr remarked that "he was going to 'roll' them and get his money back." He did not "explain what he meant." According to Starr's pretrial statement, he had told Kachougian when he arrived on the scene that he "had came to see if I could get some of the ninty [sic] dollars ($90.00) back that had

been stolen from me on or about the 2nd of June 1954 by some Korean Pimps." At this point, he said, "Lets try to scare them."

In their respective statements, the accused admit that Starr told Kachougian to "cover" the Korean men. Kachougian inserted a round in the chamber of his carbine, which was in automatic firing position. He ordered Chae to assume a squatting position. Hong Jae Hoo, the other Korean male, heard "the noise loading bullet in rifle." Although he didn't know whether the weapon was pointed at him, he was "scared." Chae told him to put up his hands, and he did so. McCallion entreated Starr to leave. Starr's own "idea" however, was to search the Koreans and "take any MPC's they might have." He went over to Hong and searched his pockets. He removed a wallet and a belt. The wallet was empty and Starr discarded it, along with the belt. Hong asked if he could return the articles to his pocket and Starr consented. Just then three shots rang out.

Pyan San Im, one of the Korean women, testified that Kachougian "yelled to Chae" to "hold hands up." Chae tried to stand up; then the shots were fired. Kachougian explains the shooting as follows: "Suddenly the Korean who was squatting in front of me jumped at me. I was holding my carbine at my hip, my left hand was on the balance of the stock, my right hand was around the trigger guard. When the Korean jumped at me, somehow or other my finger hit the trigger, and I fired a burst of three rounds . . The Korean was hit, and fell on his face, and was groaning."

Starr, a medical aid man, examined Chae. He found a bullet wound near the left shoulder blade. He did not think it was serious. Accordingly, he told the other Koreans to take Chae to the village for treatment. He, Kachougian, and McCallion, returned to the rifle pits. Kachougian called the guardhouse on the guard's "walkietalkie" and reported the incident. Later, Chae was taken to the Norwegian Mobile Army Surgical Hospital. He died at 9:05 p.m. It was

stipulated that the cause of death was a "severance of the spinal cord and punctures of both lungs, which in turn were caused by a penetrating bullet wound."

At the trial, defense counsel requested an instruction on lesser included offenses to the homicide charge. This request was based on the theory that if a robbery had been attempted as to Hong, it had been terminated before Chae was shot. The request was denied, and no instructions on lesser included offenses were given. However, the law officer instructed the court as follows: "Also, if in your deliberations, you wish to consider any offense as a lesser included offense, you should open and request my advice as to whether such offense is lesser included, and, if so, instructions as to the elements thereof."

Before considering the specific issue before us, I think it important to re-emphasize the responsibility of the law officer in regard to instructions. The law officer must provide the court-martial with the legal framework for it deliberations on the facts. Proper performance of that duty requires the law officer to consider whether the evidence reasonably raises lesser included offenses to those charged. If it reasonably appears that lesser offenses are raised, he is required to instruct on the elements of those offenses. Court members are presumed not to be learned in the law. Consequently, they are neither equipped nor required to determine whether lesser included offenses are before them for consideration. Plainly, therefore, the law officer acted improperly in not himself evaluating the evidence for that purpose. See United States v Floyd, 2 USCMA 183, 188, 7 CMR 59.

Turning to the specific issue, some general principles should first be set out to provide an appropriate frame of reference. Robbery is a compound offense consisting of an assault and a larceny. United States v Calhoun, 5 USCMA 428, 18 CMR 52. The latter component requires an intent permanently to deprive the owner of the pos-session or use of his property. Such intent is lacking when one attempts to, or actually does, take property from another under an honest claim of right. United States v Smith, 2 USCMA 312, 8 CMR 112; State v Goldsberry, 160 Kan 138, 160 P2d 690. Consequently, it is not robbery to take property from the possession of another under an honest claim of right, even though the taking is accomplished by force or violence. United States v Smith, supra; People v Rosen, 11 Cal2d 147, 78 P2d 727.

In United States v Johnson, 3 USCMA 209, 213, 11 CMR 209, we held that, unless inherently incredible, a pretrial exculpatory statement by an accused which is admitted in evidence should be accepted by the law officer in framing his issues "as though the accused had given the statement from the witness stand." Here, the matter is complicated by the fact that there are two accused. In a joint or common trial of several accused, a pretrial statement by one can be used only against him. United States v Borner, 3 USCMA 306, 12 CMR 62. At the same time, the effect of his exculpatory statement is generally limited to him. As to his coaccused, the statement is hearsay. Consequently, unless the statement falls within a recognized exception to the hearsay rule, it is inadmissible as to the coaccused. And, even if admitted without a limiting instruction by the law officer, the statement does not, in military law, become, part of the competent evidence in the case as to the other accused for the purpose of determining the issues as to them. United States v Manuel, 3 USCMA 739, 14 CMR 157. Accordingly, in reviewing the evidence as to each accused, it must be determined whether the pretrial statements of one may properly be considered with the pretrial statements of the other.

Specifically, the problem is whether two of Starr's statements are also competent evidence for Kachougian. The statements are, (1) that Starr told Kachougian that he had come "to see if I could get some of the ninty

[sic] dollars ($90.00) back that had been stolen from me . . . by some Korean Pimps," and (2) that he said to Kachougian, "Lets try to scare them" before he told Kachougian "to cover them with his Carbine." Both statements were admitted in evidence. As to Kachougian, the truth of the statements is not important. What is important, however, is the fact that they were made. Hence, they are independently relevant, and may be properly considered in evaluating the evidence as to him. Manual for Courts-Martial, United States, 1951, paragraph 139a. See: Wigmore, Evidence, 3d ed, § 1777 (6).

Inasmuch as Kachougian fired the fatal shot, I direct my attention first to him. His conduct must ▮▮▮▮▮▮▮ be judged in connection with his own intention at the time of the commission of the homicide. Depending upon his state of mind, he may be guilty of a different offense from that of his coaccused. United States v Jackson, 6 USCMA 193, 19 CMR 319.

Two purposes for Kachougian's action appear from the pretrial statements: (1) That he was ▮▮▮▮▮▮ trying to help Starr recover money that had been previously stolen from him by "some Korean Pimps," and (2) that he wanted to help Starr "scare" the Koreans. The latter intention would negative entirely the larceny element of the offense charged. However, in view of my discussion on the first of the declared intentions, I need not determine whether the second is reasonably raised by the evidence. Considering the first, Starr's remark is ambiguous. It may be construed in either of two ways. Looked at one way, it implies that Koreans other than Hong and Chae had stolen Starr's money, but that he was going to recoup his loss from them. Alternatively, the statement implies that Hong and Chae were the persons who had stolen Starr's money. In one part of his own statement, Kachougian maintains that Starr did not "explain what he meant" when he said he wanted "to get his money back." But Starr's mean-

ing was made unmistakably clear in the remarks that Starr addressed to Hong when he searched him. Unfortunately, these remarks were blocked out of Kachougian's statement, and the law officer instructed the court not to consider them. We must take the record as we find it, even though it means that an actual fact is repressed by the uncertainty of the proof. United States v Beninate, 4 USCMA 98, 15 CMR 98.

Undeniably, some of the evidence supports the view that Starr's declared intention was to take military payment certificates from Hong and Chae, although they were not responsible for stealing his money. Thus, Starr was in their presence for a half hour without in any way indicating that he believed them to be the guilty persons. On the contrary, he joined them in the general levity at McCallion's unsteadiness and, apparently, he quietly waited in their immediate presence until McCallion and Kachougian rejoined them. Only when the Koreans were preparing to leave did he take action. And he prefaced his action by saying that he was going to "roll" the Koreans. In a commonly understood sense this word is synonymous with "rob." Webster's New International Dictionary, 2d ed, page 2161. On the other hand, there is evidence from which the court members could conclude that Kachougian believed that Starr was acting lawfully. Both Kachougian and McCallion refer to Starr's insistence that he wanted "his money back." The stress here is on the claim of a right to possession. Starr told Kachougian, on his arrival at the scene, that he had come to recover money that had been stolen from him by "some Korean Pimps." His abstinence from intercourse tends to support that assertion. Consequently, when Starr determined to search the Koreans, the court-martial could find that Kachougian reasonably believed that Starr was proceeding under a lawful claim of right. Certainly, his attitude immediately after ▮▮▮▮▮▮ the offense is more consonant with an innocent purpose than with an attempted robbery. As soon as he returned to the rifle range pits, he reported the shooting to

the guardhouse.[1] In my opinion, therefore, there is sufficient evidence to require an instruction on lesser included offenses as to Kachougian.

If the court believed that Kachougian possessed an honest belief that he was merely helping Starr to recover money stolen from him, Chae's death would have occurred in the course of an aggravated assault rather than as a result of an attempted robbery. In that event, his guilt would be no greater than that of manslaughter, in violation of Article 119, Uniform Code of Military Justice, 50 USC § 713. On the same basis, Kachougian would be guilty of no more than an assault with a dangerous weapon as to Hong, assuming that the evidence would support such a finding. Consequently, the law officer erred in failing to instruct on these lesser included offenses. United States v Jackson, 6 USCMA 193, 19 CMR 319.

Considering the evidence as to Starr, much of what I have said in regard to Kachougian is applicable to him. There is, however, this important difference. Starr's words and conduct must be considered in the light of what he personally had in mind, not as they may have been interpreted by another. Granting his contention that he went to the area to recover the money stolen from him, the question is whether he then knew or honestly believed that Hong and Chae were the thieves. The part of Kachougian's statement which was blocked out provides a definite answer to this question. But, as I have noted, we cannot look to it. However, even confining ourselves exclusively to the evidence in the record, it is still apparent that Starr labored under no misapprehensions.

Hong testified that he had never seen Starr before the night of the shooting. This testimony is uncontradicted. Therefore, it is sufficient to exclude the possibility that Starr actually knew that Hong was one of the Koreans who had stolen his money. Did Starr then merely believe that Hong was one of the thieves? His statement makes no mention of such a belief. Rather, it implies that Starr realized that Hong and Chae were not the wrongdoers. He says that when he told Kachougian to "cover" the Koreans, it was "my idea" to search them and "take any MPC's they might have." His subsequent conduct changes the implication to a clear declaration that he knew that Hong and Chae were not the persons who took his money. Thus, in the afternoon of the day of the shooting, Starr discussed the incident with his commanding officer. At the conclusion of this talk, he procured ammunition and a tentmate's carbine. "After some thought" he placed the "muzzle of the carbine against . . . [his] heart and pulled the trigger with . . . [his] right thumb." The suicide attempt, however, miscarried; Starr apparently succeeded only in shooting himself in the arm. But his action unquestionably shows a "consciousness of guilt" which gives specificity of meaning to his pretrial statement. As far as Starr is concerned, therefore, the evidence did not require instructions on lesser included offenses to those charged.

I would, therefore, set aside the findings of guilty and the sentence as to Kachougian and affirm the decision of the board of review as to Starr.

---

[1] A number of courts have excluded evidence of a "consciousness of innocence." The principle of exclusion has been severely criticized, and it has been soundly argued that such evidence is admissible as a corollary to the rule which admits evidence of a "consciousness of guilt." Wigmore, Evidence, 3d ed, § 293.

The Manual for Courts-Martial does not discuss the subject specifically, and we are free to adopt the rule of evidence which we think most accords with good sense and sound trial practice. Cf. United States v Villasenor, 6 USCMA 3, 19 CMR 129. We need not, however, make a deliberate choice at this time. Suffice it to say that Kachougian's report of the shooting is admissible, and can be considered on the question of his intention. Herman v United States, 48 F2d 479 (CA5th Cir) (1931). See also: United States v Peterson, 1 USCMA 317, 3 CMR 51, on the effect of surrender in a desertion case.