UNITED STATES, Appellee

v

JOHN M. WALTER, Staff Sergeant, U. S. Air Force, Appellant

8 USCMA 50, 23 CMR 274

No. 9080

Decided June 7, 1957

*Captain Norman J. Nelson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Major Fred C. Vowell* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis P. Murray.*

## Opinion of the Court

HOMER FERGUSON, Judge:

A general court-martial convicted the accused of larceny of Military Payment Certificates (five specifications of the Charge), in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. He was sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances and to be confined at hard labor for one year. The convening authority approved only so much of the findings of guilty of specifications 1, 2 and 3 of the Charge as found accused guilty of stealing Military Payment Certificates *or Japanese national currency* of the value alleged. His action in adding the above italicized portion was taken so that the findings of the court-martial would coincide with the vague testimony relating to the type "currency" involved. The other findings and the sentence were approved. The board of review set aside and dismissed the approved findings of guilty of specifications 1, 2 and 3 of the Charge because the action of the convening authority in enlarging the offense charged constituted a material variance. They held that the convening authority had ex-

ceeded his authority in approving substantially a different charge than that alleged, to the prejudice of the accused. The board approved the findings of guilty as to specifications 4 and 5 of the Charge and upon reassessment of the sentence, in view of their holding as to the first three specifications, affirmed the sentence as approved by the convening authority. The Judge Advocate General of the Air Force, under authority of Article 74(a), Uniform Code of Military Justice, 10 USC § 874, as implemented by Air Force Manual 125–2, suspended the execution of the punitive discharge until the accused's release from confinement.

We granted a hearing on the limited issue of whether evidence showing the obtaining of funds by worthless checks in a gambling game for use in the gambling game is sufficient to support the approved convictions on specifications 4 and 5. On their face the writings here involved—which will be referred to in this opinion as "checks"—called for payment of "only Military Payment Certificates." These checks could not be sent outside the Theatre of Operations and were not unconditional orders

**51**

to pay a certain sum of money—essential qualities of negotiability.

The facts relating to the questioned specifications are confused. All agree that in the course of a gambling game in an Air Force billet in downtown Tokyo, Japan, the accused issued several incomplete "checks for Military Payment Certificates." These checks were signed by the accused and he had filled in the amount of each in numerals. They were neither dated nor numbered nor did they have a named payee. There had been some drinking on the part of the participants and the game was heated and of long duration. However confused the various narratives of the questioned game may be, a few things are clear. Two participants in the game cashed some of these incomplete forms directly for the accused and obtained others of the same ilk that were introduced directly into the game by the accused through the "pot." The checks were cashed for the accused by the other participants of the game solely to assist him in his participation in the game. They were cashed when he needed money to put in the "pot"— for the "payees-to-be" to win—or were put directly into the "pot" when the accused had no Military Payment Certificates. When the "smoke of battle" had cleared, and cooler considerations prevailed, the two participants who had been fortunate enough—though there is now some doubt as to their fortune— to end up "winners" of all the checks discovered that the accused had bilked them with checks of no intrinsic value. These valueless checks are the basis for specifications 4 and 5. There is a dispute as to how the various checks were cashed but in our view this is unimportant. The checks were cashed for Military Payment Certificates to be used by the accused to gamble with the persons advancing the Military Payment Certificates.

## I

There is no doubt that gambling is illegal in the great majority of jurisdictions in the United States either by statute or by judicial interpretation of the public policy. See 24 Am Jur, Gaming and Prize Contests, §§ 3, 12, 61. As the Supreme Court noted in Irwin v Williar, 110 US 499, 510, 4 S Ct 160, 28 L ed 225:

"In England, it is held that the contracts, although wagers, were not void at common law, and that the statute has not made them illegal, but only non-enforceable; Thacker v. Hardy *ubi supra; while generally, in this country, all wagering contracts are held to be illegal and void as against public policy.* Dickson's Exr. v. Thomas, 97 Pa. St., 278; Gregory v. Wendell, 40 Mich., 432; Lyon v. Culbertson, 83 Ill., 33; Melchert v. Tel. Co., 3 McCrary, 521; S. C., 11 Fed. Rep., 193, and n.; Barnard v. Backhaus, 52 Wis., 593; Kingsbury v. Kirwan, 77 N.Y., 612; Story v. Salomon, 71 N.Y., 420; Love v. Harvey, 114 Mass., 80." [Emphasis partially supplied.]

This theme was again played by the Supreme Court when it stated that gambling is *contra bonos mores* and is generally to be "prevented and suppressed in the interest of the public morals and the public welfare." Marvin v Trout, 199 US 212, 26 S Ct 31, 50 L ed 157. In the case of Schur v Johnson, 2 Cal App2d 680, 38 P2d 844, the Supreme Court of California was even more explicit in stating their policy toward gambling transactions.

"It is the uniform rule of our courts that transactions involving a prohibited gambling game will not be enforced for the reason that such transactions are against public policy and in conflict with the welfare and morals of society. 12 R.C.L. p. 747, § 52; 6 R.C.L. p. 712, § 120. In the authority last cited it is said in that regard: 'Courts of justice will never recognize or uphold any transaction which, in its object, operation, or tendency, is calculated to be prejudicial to the public welfare. * * * A contract is against public policy if it is injurious to the interests of the public or contravenes some established interest in society, or if it contravenes some public statute, or is against good morals, or tends to interfere with the public welfare or safety.' "

Generally, the law will not force a loser to "pay up" and a winner will not be forced to return his gain. *Ex turpi causa non oritur actio.* The jurisdictions apply various devices to reach the conclusion of unenforceability, but the end is the enforcement of the public policy. Circuit Judge Evans of the Seventh Federal Judicial Circuit had this to say about gambling:

"Moreover, in the absence of any statute condemning gambling as illegal, the Federal courts have consistently condemned it as against public policy. In some of its phases it has been condemned as illegal.

. . . . .

". . . Plaintiff has no legal right in a business, the conduct of which was gambling, for which he may obtain protection either in an action at law, or by a suit in equity. He had no legal rights to protect. Therefore defendants could not invade them.

"It would be a refinement of distinction to hold that the public may be protected against the business of gambling, but the business of making machines usable only in gambling falls outside the pale of condemned action. We find that most courts have refused to make the distinction. They have condemned gambling and gambling transactions." [Maltz v Sax, 134 F2d 2 (CA7th Cir) (1943).]

Some jurisdictions have carried this reasoning over to the criminal law as a defense to the crime of robbery. In one case where the victim "won" disputed goods from the robber, the court said:

". . . It is the law in this state that certain games of chance, such as lotteries, are illegal; that the winner gains no title to the property at stake nor any right to possession thereof; and that *the participants have no standing in a court of law or equity.* Gridley v. Dorn, 57 Cal. 78, 40 Am. Rep. 110; Bank of Orland v. Harlan, 188 Cal. 413, 421, 206 P. 75; 16 Cal. Jur. p. 716. In jurisdictions where such is the state of the law the weight of authority appears to favor the view that the recaption

by force or fear of money lost at illegal games is not robbery, although the act may be punishable as an unlawful assault or trespass." [People v Rosen, 11 Cal2d 147, 78 P2d 727. Accord, State v Price, 38 Idaho 149, 219 P 1049.] [Emphasis supplied.]

Such reasoning would not apply, of course, where the robber—or as in the instant case the cheater—did not have an interest in the goods stolen.

We indicated that gambling is an offense under Article 134, Uniform Code of Military Justice, 10 USC § 934, when we said in the Snyder case that Article 134, supra, "and its immediate precursors in military law have been held to condemn drunkenness, use of profane language, wearing improper uniform, use of indecent language to a female, uncleanliness in person, *and gambling.*" (Emphasis supplied.) United States v Snyder, 1 USCMA 423, 426, 4 CMR 15.

General George Washington, in commenting on a sentence meted out in a gambling case, stated with regard to the offense and the sentence given— "A practice so infamous in itself as that of gaming, so prejudicial to good order and discipline, and so contrary to positive and repeated General Orders . . . demanded a much more severe penalty." G. O. Hdqrs. Valley Forge, May 21, 1778. We can but wonder why the would-be payees of this drama were not left in *status quo* with regard to their "winnings." They regretted no doubt that there was no honor among some gamblers and took the issue to their superiors for official action with regard to the illegal transactions. Officialdom moved rapidly and we must now answer the question of whether United States courts-martial will impose criminal sanctions on persons who cheat others engaged jointly with them in illegal acts when the cheat was the obtaining of Military Payment Certificates *from persons in the game to use in the game*—and in fact won by the persons advancing the Certificates for the game!

II

It is clear from what we have said

above that gambling is against public policy and that the sub- ▮ jects of the alleged larceny were engaging in this illegal activity with the accused. It is also clear that the checks in question, when passed, were void *ab initio* and regardless of a private agreement between the participants of the illegal transaction could never have legal efficacy. We are now asked to apply legal criminal sanctions to an issuer of void instruments—which issuance occurred during an illegal gambling operation—because of the incredible theory *that the bilking of one participant in an illegal operation by another similarly engaged is somehow an offense against the public policy!* To do this would be to police the conduct of persons within illegal operations that do not touch the general public. We will not act as the "strong arm" of a collection scheme for gamblers within the service in order to intimidate payment by "debtors" of void gambling debts. The fact that one "welshes" on his gambling debts and becomes known as a "welsher" is not a crime.

In the instant case there is no question but that the checks involved in the questioned specifications were issued directly to coparticipants of the accused in a gambling operation or that the checks issued flowed to the ultimate holders through the game's "pot." The money was advanced to be used in the game participated in by the accused and two accusers. In fact, Gresham's theorem acted to insure that *all* checks eventually went to "pot." *The checks were made out wholly for the facilitation of the game.*

Cynics would say that the gamblers gambled on the accused having money in the bank and lost. Gamblers would say that the accused was a "welsher" and should be punished.

It is argued that this transaction should be viewed for what it is and that it is a simple case of obtaining money by false pretenses. Though the principle implicit in this analysis is appealing, we cannot agree that it is a simple fraudulent check transaction. We are not bound to close our eyes to

reality on the basis of negotiable instrument concepts merely because a crime involves an instrument that is quasi-negotiable but which is not in fact a negotiable instrument. We can and do look at the entire criminal transaction involved. The answer is simply that this was a cheat committed on and by coparticipants in an illegal gambling transaction. United States courts-martial will not impose criminal sanctions under such circumstances, where good order and discipline in the armed forces has not been prejudiced and the conduct was not of a nature to bring discredit on the armed forces. The accused here was charged with larceny from gamblers and not with violation of Article 134, supra. We had occasion to discuss this related problem in the case of United States v Holt, 7 USCMA 617, 23 CMR 81. In that case the accused was charged with a violation of Article 134, Uniform Code of Military Justice, supra, and we expressly rejected the contention in that case that the offense was in fact larceny. We are not called upon to express, and do not express, an opinion here on the applicability of Article 134 to the instant fact situation. It has been suggested that our holding in this case will somehow encourage gambling. We think that it will have the opposite effect. It will deprive service gamblers, professional and semiprofessional, of a club to hold over those foolish enough to engage in this type of dissipation. A "hard money" policy among gamblers will surely reduce the amount of money available for gambling.

The decision of the board of review is reversed and the charges are dismissed.

QUINN, Chief Judge (concurring):

There are numerous instances in the law in which the consent of a partici- ▮ pant to a particular transaction determines whether or not the act is criminally punishable. So, for example, consent distinguishes rape from mere intercourse. It has also importance in a prosecution for larceny. Thus, paragraph 200*a* (4) of the Manual for Courts-Martial, United States, 1951,

54

points out the general rule that "a taking . . . of property from the possession of another is wrongful *if done without the consent of the other."* (Emphasis supplied.) In my opinion, the participants in the gambling game in this case consented to the accused's acts.

Each of the persons in the game is chargeable with knowledge of its illegal nature. Certainly all the gamblers knew that they had no right to the money ostensibly represented by the checks deposited in the "pots." The best they could expect was that the accused would permit the checks to be paid on presentment. Actually, therefore, they were consenting to the use of the paper on the bare chance that it would be realizable in cash. As Judge Ferguson points out, they "gambled . . . and lost." As far as these checks are concerned, therefore, the participants in the game cannot complain that they were defrauded of what was rightfully theirs.

Consent is also apparent in regard to the "cashed" checks. The checks were cashed, as Judge Ferguson notes, "wholly for the facilitation of the game" in that the proceeds were to be put into particular "pots." Unquestionably they were regarded as the equivalent of money, but each gambler who cashed a check is chargeable with the knowledge that, since the check was an integral part of the game, its value depended solely upon the will of the accused. As a consequence, by their acts, they also agreed to gamble on the honesty of the accused's intentions. They misjudged those intentions and lost in the transaction. But their error of judgment did not vitiate their consent to gamble on the value of the accused's paper. They bought a "pig in a poke," but their bad bargain was not a larcenous transaction. Accordingly, I join Judge Ferguson in reversing the conviction and dismissing the charges.

LATIMER, Judge (dissenting):

I dissent.

The author of the original opinion misses the crime of larceny because he is so intent upon assailing the vices of gambling. Of course, I join him in his condemnation of that crime but not to the point where I am willing to legalize thievery. The Chief Judge takes a somewhat different approach for reversal in that while he joins partially with Judge Ferguson, he finds the victims gambled on the check being worthless, a mental condition disputed by the record and the pattern of human behavior. I, for reasons hereinafter set forth, part with both my associates and seek to solve this issue on basic legal concepts rather than moral principles.

Because the Services are departments of the Federal Government, they have a direct interest in law observance, order, and good government, and they become a necessary party to a criminal prosecution. Therefore, that part of the civilian law of contracts laying down principles governing gambling transactions has no place in a system which has for its underlying purpose the punishing of offenders against the penal statutes of the sovereignty. The doctrine that the contributing guilt of one party can be pleaded as a bar to a prosecution by the Government in this type of offense is without the slightest foundation or justification in sound logic or reasoning. For that reason, in order to decide this case, I do not hesitate to apply the ordinary principles of criminal law.

To better consider these principles, it should first be understood that this prosecution is founded upon checks for which a valuable consideration, namely money, was given and paid at the time the check was delivered. It should further be understood that the checks were given to the persons who advanced the money and who relied on the representation that they would be paid upon presentment. With those comments for my background, I look to the definition of larceny so that the facts of this case can be measured to ascertain if they established beyond a reasonable doubt each and every element of that offense. If they do, then the findings and sentence should be affirmed, regardless of

the moral sanctions I might apply against games of chance.

In the cases of United States v Aldridge, 2 USCMA 330, 8 CMR 130, and United States v Buck, 3 USCMA 341, 12 CMR 97, we advanced the thought that Article 121 of the Code, which defines larceny, combined three prior offenses. The one of particular moment in the case at bar is obtaining money by false pretenses, and the present law makes that form of acquisition unlawful if there is a concurrent intent to deprive the owner permanently of his property. The essential elements of that species of the crime are these: (1) That the accused wrongfully obtained the property of another; (2) that the property belonged to a certain person named or described; (3) that the property was of the value alleged or some value; and (4) that the obtaining was with intent permanently to deprive the owner of its use and benefit. To show they have been proven, I will discuss them seriatim. In this instance, the accused acquired possession of cash, or its equivalent, by a false representation. The Manual for Courts-Martial states that a person makes a false pretense by uttering a check made by him if at the time of the uttering he did not honestly intend to have sufficient funds in the bank available to meet payment of the check upon its presentment for payment in due course. As to the second and third elements, there can be no question about the sufficiency of the allegation and proof to show the property belonged to a third person and its value was not in dispute for it was in the form of money. With regard to the fourth ingredient, the facts and circumstances shown by the testimony clearly support the court-martial's finding that the requisite criminal intent was present. If, therefore, as I point out, the crime is proven by the quantity and quality of evidence required by the Code, I ask, then, what is left for us to decide?

We are an appellate court created to decide cases by the law and if we only apply long-recognized legal maxims, a fair and just result usually follows. Defense counsel concede that over the years, military law has consistently held that the issuance of worthless checks under similar circumstances is a military offense, and they cite sixteen cases to support that theory. That well-developed body of military law is overruled without being mentioned, apparently because it is believed moral requirements compel us to discourage gambling in the Service. Without debating what the effect of this case will be, I merely go on to say that we make unique law when we say we will not countenance the conviction of a thief because he stole from a gambler. As a caveat to those in the Service who play penny ante, I can only say, do not cash a check for your most trusted friend if he happens to be in the game.

In answer to the remaining contention of the Chief Judge, I merely call attention to the fact that he emphasizes the general rule that "a taking . . . of property from the possession of another is wrongful if done without the consent of the other." That, of course, is correct but larceny in the military can be committed if possession is obtained with consent. Whenever an accused obtains money by trick or false pretenses, possession is obtained with consent of the owner but if it is done with intent to deprive him permanently of his property, it is larceny. Furthermore, the court-martial found that the accused defrauded the victims of their property. There is evidence to support that conclusion and they could not have been defrauded had they given their consent.

I would therefore affirm the board of review.