UNITED STATES, Appellee

v

ANTONIO MALDONADO, JUNIOR, Airman Second Class, U. S. Air Force, Appellant

15 USCMA 285, 35 CMR 257

[redacted]

No. 18,029

April 2, 1965

[redacted]

*Major James E. Caulfield* argued the cause for Appellant, Accused. With him on the brief was *Colonel Robert O. Rollman.*

*Lieutenant Colonel Robert M. Haynes* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

KILDAY, Judge:

### I

On separate occasions, some six weeks apart, accused became involved with the same individual who was the victim of the alleged offenses with which we are concerned in the instant case. As a result, accused was tried by general court-martial, at Amarillo Air Force Base, Texas, on charges of robbery and assault with a dangerous weapon, in violation of Articles 122 and 128, Uniform Code of Military Justice, 10 USC §§ 922 and 928. He pleaded not guilty, but was convicted and sentenced to bad-conduct discharge, total forfeitures, confinement at hard labor for six years, and reduction to the grade of airman basic. The convening authority reduced the period of confinement to three years, but otherwise approved the findings and sentence, and a board of review in the office of The Judge Advocate General of the Air Force thereafter affirmed. Accused then appealed to this Court, and we granted his petition for review.

The validity of the finding of guilty of assault with a dangerous weapon, growing out of accused's separate attack on and cutting of the victim with a knife, is not in issue. Nor do the circumstances of that offense bear in any fashion on the robbery count. Accordingly, we need not treat further with that finding.

The three assignments of error, filed by appellate defense counsel in accused's behalf, all relate to his conviction for robbery. Inasmuch as a gambling debt was involved, however, and in view of the conclusion we reach on the assignment based on that fact, we may confine our consideration to that single issue.

### II

Because we treat only with the one point, a complete and detailed recitation of the evidence, and all the circumstances, is unnecessary. However, to place the question in perspective, it will be helpful to relate the basic facts giving rise to the alleged robbery. The facts pertinent to our inquiry, as shown by the record, are essentially as follows.

It is undisputed that, some time during the month prior to the night of the alleged robbery, the victim, Givens, had played pool with one Thomas on the base. The two admit they were gambling, and Thomas was the loser to the extent of $60.00. He therefore gave Giv-

ens an "IOU" in that amount. Although the instrument recited that the indebtedness was for a personal loan, it is agreed it represented a gambling loss as a result of "shooting pool."

The prosecution's evidence shows that subsequently, after payday, Thomas was drinking beer and talking with accused and another airman. In the course of the conversation, Thomas' debt to the victim was mentioned, and accused and the other man agreed to help get the IOU back. Thomas thereupon went to Givens' quarters and, on the pretext of making payment, got the victim to return with him to his own billet. When they got there, accused and the other airman accosted Givens. Accused placed a knife to the victim's throat, and Thomas demanded the IOU. As Givens did not have it with him, he was forced to disclose its location in his quarters. Accused continued to hold the victim at knifepoint while Thomas went after the acknowledgment of indebtedness. When the latter returned with the IOU, he tore it up in Givens' presence. The victim did not owe any of the three men any money, and the note was destroyed without his permission.

Upon the above evidence, the court-martial convicted accused of robbery, finding that by the use of force and fear he stole the IOU from the victim's presence.

### III

The gist of the defense position on this matter is that, under the above circumstances, accused cannot be guilty of robbery by assisting Thomas in recovering the note he executed to cover his gambling loss, even though force and violence were used. Regardless of how reprehensible and outrageous accused's conduct may be, and notwithstanding that his act is obviously not free of all criminality,[1] we believe the assertion of error is well taken.

The question raised is not wholly

new in this Court. Thus, it is well settled that robbery is a compound offense, consisting of an assault and larceny. See United States v Calhoun, 5 USCMA 428, 18 CMR 52; United States v Kachougian, 7 USCMA 150, 21 CMR 276. Accordingly, in the last-mentioned case, we proceeded to accept the principle of law that:

". . . a person is not guilty of robbery in forcibly taking property from the person of another, if he does so under a bona fide belief that he is the owner of such property, or is assisting an owner. People v Rosen, 11 Cal 2d 147, 78 P2d 727 (1938)." [United States v Kachougian, supra, at page 156.]

That is so because one who takes that which is, or which he believes to be, his own property, lacks the felonious intent requisite to sustain the larceny aspect of a robbery.

Subsequently, in United States v Walter, 8 USCMA 50, 23 CMR 274; United States v Lenton, 8 USCMA 690, 25 CMR 194; and United States v Young, 8 USCMA 695, 25 CMR 199, this Court was concerned with convictions for larceny and bad check offenses which were an integral part of a gambling transaction. We pointed out gambling is unlawful under the Uniform Code of Military Justice, and that a money obligation incurred by one person in favor of another in an illegal game of chance is not recognized as an enforceable obligation. Accordingly, we refused to sustain findings of guilty of larceny or of bad check offenses under the General Article, when the instruments by which the alleged misconduct was committed were issued as part of the illegal gaming activity, and could never enjoy legal efficacy. Again, among other State and Federal authorities, we placed reliance on People v Rosen, 11 Cal 2d 147, 78 P2d 727 (1938).

More recently, in United States v Dosal-Maldonado, 12 USCMA 442, 31 CMR 28, the Court had occasion to consider a larcency conviction. The accused had lost money in a poker game and, the next day, sought to recoup

---

[1] Indeed, the defense freely concedes accused may be guilty of a lesser offense.

his losses by stealing from one of the players whom he thought had cheated him. To the extent that accused recovered his gambling loss, we held his guilty plea improvident, and sustained a conviction for larceny only as to the excess.

Finally, in United States v Brown, 13 USCMA 485, 33 CMR 17, we were confronted with a situation markedly similar to the one presently before us. Brown, like the instant accused, was found guilty of robbery. He had been a losing participant in an illegal game of chance and, believing he had been cheated, subsequently sought to make himself whole. He did so at gunpoint, but asserted he was merely recovering his losses from the gambler that had bilked him. Under those circumstances we found the law officer's instructions prejudicially deficient with regard to title to property lost in a gambling game and the loser's right to recaption, reviewing authorities dealing with recovery of money lost at gambling, and declaring in the course of our opinion:

". . . [I]t is plain that, under military law, one does not steal when he effects the recaption of money he has lost in a crooked gambling game. United States v Dosal-Maldonado, 12 USCMA 442, 31 CMR 28. This is so because his taking is by claim of right under the bona fide belief he is the owner. For that reason, one who takes property forcibly under those circumstances may be guilty of assault, but is not guilty of robbery. United States v Kachougian, 7 USCMA 150, 21 CMR 276. See also United States v Walter, 8 USCMA 50, 23 CMR 274; United States v Lenton, 8 USCMA 690, 25 CMR 194; United States v Young, 8 USCMA 695, 25 CMR 199. Reference to the above cases makes it apparent this Court has adopted the rule of People v Rosen, supra, and allied cases." [United States v Brown, supra, at page 495.] [Emphasis partially supplied.]

As may be seen, the Dosal-Maldonado and Brown cases involved recovery of gambling losses by one who claimed he was cheated, whereas there is no assertion that the pool contest in the case at bar was other than fair and honest, albeit an unlawful game of chance. That distinction is of little significance, however. Under the facts of those two cases—where nearly every jurisdiction apparently recognizes that recovery of his losses by a gambler is not larcenous—it was unnecessary for us to go beyond the situation presented and set down explicitly a rule which would cover the instant case. Nevertheless, we did seek to provide some guidelines. Thus, we expressly reminded those working in the field of military justice that our decisions make it clear this Court has adopted the rule of Rosen and allied cases. As the Supreme Court of California stated in that case:

". . . While there appears to be a conflict of authority on the question whether felonious intent is present when the defendant seeks the recaption of money lost by him at an illegal game (note, 135 Am St Rep pp 485–489), the weight of authority supports the conclusion that the intent to steal is lacking in such a case, for the law recognizes no title or right to possession in the winner." [People v Rosen, 11 Cal 2d 147, 78 P2d 727, 728.]

See also 46 Am Jur, Robbery, § 12. Cf. United States v Mitchell, 30 CMR 889.

Analysis of our opinions, therefore, shows this Court has aligned itself with the weight of authority and recognizes the majority rule that one who recovers losses suffered in illegal gambling is not guilty of larceny, and hence not guilty of robbery. We apply that rule in the case at bar.

As we noted in the Walter case, supra, gambling is unlawful under the Uniform Code of Military Justice. Thus, Thomas' losses from the pool game with the victim, played on the base, were clearly not collectible and any evidence of indebtedness issued as part of the illegal gaming activity was not enforceable. Indeed, the Govern-

ment concedes that the IOU had no legal efficacy. Thomas' liabilities and obligations, and his rights and interests, were no different, insofar as the instrument indicating indebtedness is concerned, than they would have been had he paid off his gambling loss on the spot in cash. Accordingly, we conclude any action by him in effecting recaption of the note would not be larcenous.

Of course, the accused, himself, did not incur the gambling loss. It is apparent, however, that accused stands on the same footing as Thomas, for he was assisting and acting in concert with the latter in regaining the IOU from the victim, Givens. We repeat what was stated in *Kachougian,* quoted hereinbefore:

> ". . . [A] person is not guilty of robbery in forcibly taking property from the person of another, if he does so under a bona fide belief that he is the owner of such property, *or is assisting an owner.*" [Emphasis supplied.]

For the above-stated reasons, we conclude that accused's conviction for robbery must be overturned. United States v Kachougian, United States v Walter, United States v Lenton, United States v Young, United States v Dosal-Maldonado, United States v Brown, all supra. As we have indicated, however, accused is not entirely free of criminality for his part in the forcible recaption of the IOU. While he is not guilty of the larceny aspect of robbery, accused's action in holding a knife at Givens' throat, while the note was recovered and destroyed, constitutes assault with a dangerous weapon, which we approve as a lesser included offense to the robbery finding returned by the court-martial. United States v Brown, supra. See also United States v Calhoun, supra.

Accordingly, the decision of the board of review as to the finding of guilty of robbery is reversed. Accused's conviction for that crime must be and is set aside. We affirm a finding of the lesser offense of assault with a dangerous weapon, under Article 128, Uniform Code of Military Justice, 10 USC § 928, together with the other separate and valid conviction of accused under that Article for cutting Givens with a knife. The record is returned to The Judge Advocate General of the Air Force for submission to the board of review, for reassessment of a sentence appropriate for the affirmed findings.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

If this accused intended to help Thomas recoup a gambling loss he went about it in a most unusual way. He and Vargas, the third of the trio that attacked Givens, had their faces concealed by handkerchiefs, in the old-fashioned tradition of holdup men. Technique aside, the record is devoid of a single word to indicate the accused entertained a "bona fide belief that he . . . [was] . . . assisting" Thomas to recover his own property, as required by United States v Kachougian, 7 USCMA 150, 156, 21 CMR 276. Even his own lawyer never suggested the accused had any such belief; all he argued was that the writing had "no value whatsoever" because it was founded upon a gambling transaction.

The accused did not testify, so there is no direct evidence of his state of mind in participating in the transaction. The testimony of Givens, the victim, and Thomas, the debtor, is is all we have. Givens testified the IOU was given to him by Thomas sometime before the day of the incident. In the interim, Thomas had paid him a small amount in reduction of the obligation. On October 1, Thomas came to Givens' barracks and told him he "would pay the money he owed . . . [Givens] . . . if . . . [Givens] would accompany him" to his barracks. The reason he gave for asking Givens to go to the barracks was that he wanted his "roommates for witness [sic]." Givens went with Thomas. As soon as he entered the latter's room, he was seized from behind by two men, and a knife was put "at . . . [his] throat." Each of his attackers was

disguised by a handkerchief across the lower half of the face, but he identified the accused by "his voice, . . . his hair, and build." The IOU was demanded of, and eventually obtained from, him.

Thomas substantially corroborated Givens. Significantly, he made no claim that, in resorting to the stratagem to get Givens to his barracks, he intended only to get back what he believed was his own property. He insisted Givens gave him "permission" to get the IOU from his room, and that insistence implies he believed he was not legally entitled to the IOU without Givens' consent. More importantly, there is absolutely nothing in Thomas' testimony to indicate he told the accused the IOU was his, not Givens', and that the accused agreed to help him recover his own property. According to his testimony, Thomas did not tell the accused how the instrument originated. His entire testimony of the discussion he had with the accused and Vargas about the IOU is as follows:

". . . I came in somewhere about 12:30, and came up to my barracks, and Airman Maldonado and Airman Vargas were sitting there drinking beer, so I went in and sat down and drank a few beers with them, and at this time I was telling them about me owing Givens some money, so Airman Maldonado said, 'You go get Givens and bring him over here, and Vargas and I will get your IOU back,' and Vargas said, 'OK'; so I went over to his room and told him to come over to the barracks, I had some money to give him, and he came over, and we were walking down the hall, and Maldonado came out and put a knife up to his neck, and so I asked him where the IOU was, and he said it was in his wallet over in his room, and so I went over to his room and got the wallet and brought it back, and he looked through it, and there wasn't any IOU in it, and I looked through it and there wasn't any IOU in it, and he told me he remembered

putting it under the towels, and so I went back over there and got it, and came back and tore it up and threw it away; then Airman Givens left."

On the evidence in this record of trial, I find it impossible to conclude that the accused participated in the incident in the honest belief he was helping recover property which belonged to Thomas.

I have other reservations about the validity of the principal opinion. For example, the majority apparently do not regard as significant the difference between the debt and the IOU as evidence thereof. So far as the record of trial shows, the paper itself did not belong to Thomas. Givens testified the writing was prepared by Airman Jefferson, and was on "regular note paper." Thomas said nothing about the original ownership of this paper. From Givens' testimony, it can reasonably be concluded that he, not Thomas, supplied the paper; and therefore, Thomas never had any claim to the paper; and neither he nor the accused had reason to believe Thomas was legally entitled to it. Also, the majority takes for granted that a game of pool is a game of chance, and the playing of the game for a stake is gambling. I suggest the matter is not as plain as all that. The Supreme Court of California in In re Allen, 59 Cal 2d 5, 377 P2d 280 (1962), held that bridge played for stakes did not constitute a violation of a statute prohibiting a game of chance for money. The Court referred to the "accepted meaning" of the phrase " 'game of chance' " as established by numerous adjudications in many States. "The test," said the Court, "is not whether the game contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game." It seems to me that, as a game, pool has a larger element of skill and a lesser element of chance than bridge. Id., at page 281.

I would affirm the conviction.